Dianne M. Nast
(NJ #012611976)
NastLaw LLC
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
Telephone: (215) 923-9300

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| FWK Holdings, LLC, individually and on behalf of all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. |
| v. | : | |
| | : | |
| NOVO NORDISK INC., | : | **CLASS ACTION COMPLAINT** |
| ELI LILLY AND COMPANY, | : | |
| SANOFI-AVENTIS U.S., LLC, | : | |
| CVS HEALTH CORPORATION, | : | DEMAND FOR JURY TRIAL |
| CAREMARK RX, LLC, | : | |
| EXPRESS SCRIPTS HOLDING COMPANY, | : | |
| EXPRESS SCRIPTS, INC., and | : | |
| OPTUM RX, INC., | : | |
| | : | |
| Defendants. | : | |

FWK Holdings, LLC ("FWK" or "Plaintiff") with its principal place of business located at 800 Roosevelt Building A Suite 120 in Glen Ellyn, Illinois, individually and on behalf of all other persons and entities similarly situated, alleges the following based upon personal knowledge as to Plaintiff, and information and belief. Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein.

## I.  SUMMARY OF CLAIMS

1.     Plaintiff brings this action against three manufacturers of analog insulin medications—Eli Lilly and Company ("Lilly"), Novo Nordisk Inc. ("Novo"), and Sanofi-Aventis U.S., LLC ("Sanofi") (collectively, the "Manufacturer Defendants") and the four main Pharmacy Benefit Managers ("PBMs") in the United States: CVS Health Corporation ("CVS"), Caremark Rx, ("Caremark"), Express Scripts, Inc. ("Express Scripts"), and OptumRx, Inc. ("OptumRx") (collectively, the "PBM Defendants").

2.     Plaintiff asserts claims on behalf of itself and on behalf of three Direct Purchaser Classes (the "Classes") of analog insulin drugs: (1) Direct Purchasers of NovoLog® ("NovoLog") and Humalog® ("Humalog") from Defendants Eli Lilly and Company and Novo Nordisk Inc. during the period January 1, 2009 through the present; (2) Direct Purchasers of Lantus® ("Lantus") and Levemir® ("Levemir") from Defendants Sanofi-Aventis U.S., LLC and Novo Nordisk Inc. during the period January 1, 2009 through the present; and (3) Robinson-Patman Act Direct Purchasers of NovoLog, Humalog, Lantus, and Levemir.  The time period of January 1, 2009 through the present is referred to herein as "Class Period" and is applicable to each Class.

3.     During the Class Period, FWK purchased approximately $113,143,774.13 of Lantus directly from Sanofi, approximately $25,455,136.10 of Levemir and $64,418,385.92 of Novolog directly from Novo, and approximately $45,419,536.95 of Humalog directly from Lilly.

4.     Defendants have collectively and unlawfully colluded to restrain and/or eliminate competition by engaging in an anticompetitive conspiracy designed to foreclose competition in the market for analog insulin drugs in the United States, in violation of Section 1 of the Sherman Act. This misconduct enabled Defendants to overcharge direct purchasers for analog insulin drugs.

**A.     Antitrust Claims**

5.      Defendants engaged in an overarching scheme to fix the prices of analog insulin drugs for direct purchasers.  Beginning in or about 2009, Defendants together made successive, lockstep price increases for analog insulin drugs without valid economic justification. Such price increases occurred despite the absence of *any* changes in the Defendants' analog insulins that would justify higher prices.  Faced with impending expiration of patents covering their analog insulin products and looming generic entry to the market, Defendants entered anticompetitive agreements to artificially inflate prices and maximize profits.  Defendants deprived Plaintiff and members of the Classes of a competitive market for analog insulin drugs.

6.      Defendants also knowingly and willfully acquired, maintained, enhanced and unlawfully exercised monopoly power in the analog insulin market through their anti-competitive agreements with the specific intent to monopolize the analog insulin market, and preventing competition in the market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7.      Further, Defendants knowingly and willfully violated the Robinson-Patman Act, 15 U.S.C. § 13.

8.      Defendants' conduct caused Plaintiff and members of the Classes to pay considerably higher prices.

9.      Absent the Defendants unlawful agreement to improperly raise analog insulin prices, Plaintiff and members of the Classes would have paid much less in a competitive market for the analog insulins they purchased.

10.     The damages suffered by Plaintiff and members of the Classes therefore arise as a direct and proximate result of Defendants' scheme and agreement to inflate and fix analog insulin prices.

11.     Plaintiff, on behalf of themselves and members of the Classes, seeks redress for the overcharge damages sustained as a result of Defendants' unlawful conspiracy and other anticompetitive conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  But for Defendants' anticompetitive conduct, Plaintiff and members of the Classes would not have paid supra-competitive prices for analog insulin drugs.

**B.     RICO Claims**

12.     Plaintiff seeks to recover damages incurred by itself and members of the Classes due to Defendants' "Price Inflation Schemes," described herein, perpetrated to artificially inflate the insulin prices paid by members of the Classes.

13.     Defendants conducted their Price Inflation Schemes through repeated acts of mail and wire fraud that amounted to a pattern of racketeering activity in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and New Jersey's Racketeer Influenced and Corrupt Organizations Act ("New Jersey RICO"), N.J.S.A. § 2C:41-1 *et seq.*  Defendants' false representations concerned the distributor and retail prices of Humalog, Novolog, Lantus, and Levemir.

14.     Pursuant to their Price Inflation Schemes, the Manufacturer Defendants separately conspired with each of the PBM Defendants to unlawfully drive up the "Wholesale Acquisition Price" or "WAC" price of the analog insulin drugs.  The ultimate price paid by Plaintiff and members of the Classes for the analog insulin drugs ("Direct Purchaser Prices") is tied to, or tethered, to the WAC.  As WAC rises so do Direct Purchaser Prices.

15.     A rising WAC, in turn, unlawfully drove up the "Average Wholesale Price" ("AWP") for these same drugs paid by consumers farther down in the stream of commerce.  There was a *quid pro quo*.  Under the Price Inflation Schemes, the Manufacturer Defendants received

favorable treatment on the PBM Defendants' "formulary" lists, and in return, the PBM Defendants received an unlawfully inflated "spread" between the AWP price and the actual, net selling price. The spread was significant to PBM Defendants because it determines the compensation they receive from their health insurer clients.[1]   The first step in the process, however, is for the Manufacturer Defendants to raise WAC prices, to the detriment to Plaintiff and members of the Classes.

16.     Pharmaceutical wholesalers, like Plaintiff and many members of the Classes, sell pharmaceuticals to pharmacies directly, but PBM's determine the prices insurers ultimately pay for those medications.  PBM manage prescription medication benefits for health insurers, among others.  The PBM Defendants, specifically, were responsible for managing the prescription medication benefits maintained by approximately 180 million Americans, or 80% of the insured public.

17.     PBM Defendants fulfill their role by negotiating directly with the Manufacturer Defendants and other drug manufacturers on behalf of health insurers to determine the real retail prices of analog insulins and other pharmaceuticals.  PBM Defendants negotiate discounts from the AWP prices that manufacturers such as Manufacturer Defendants publish with respect to their products.

18.     In theory, this is supposed to work to the benefit of insureds/consumers.  After consumers purchased the Manufacturer Defendants' analog insulins (or other medications) at

---

[1]     Additionally, PBM's have written their contracts to retain for themselves other payments from the Defendant Drug Manufacturers, including among other things discounts, "administrative or other fees," and/or side deals, and thus, the Defendant PBMs profit handsomely from rebates. PBM's misleading label these various rebates and fees in such ways to retain control over the amount of kickbacks they keep for themselves.

physical or online pharmacies, the Manufacturer Defendants pay the PBM Defendants "rebates" equal to the difference between the Manufacturer Defendants' published AWP prices and the negotiated "net selling prices" secretly agreed upon by the Manufacturer Defendants and the PBM Defendants.  The money paid by Plaintiff and members of the Classes to the Manufacturer Defendants for inflated WAC prices is used to pay these rebates.

19.     The PBM Defendants then give a portion of the rebate to their health insurer clients, keeping the remainder for themselves. By inflating WAC prices, and ultimately, AWP prices of their analog insulins, the Manufacturer Defendants provided the PBM Defendants with significantly greater "spreads" that the PBMs utilized to enhance the compensation they received from their insurer clients, purportedly for "negotiating" rebates from legitimate AWP prices.

20.     That pricing strategy directly served the PBM Defendants' interests in augmenting the payments they received for purportedly negotiating with the Manufacturer Defendants to receive discounts from their analog insulins' AWP prices.

21.     When a Manufacturer Defendant enlarges the spread between a drug's AWP and net price, Plaintiff and members of the Classes are forced to pay higher price because the AWP price is moved via changes to the WAC price.

22.     Promoting the PBM Defendants' interests in that manner also served the Manufacturer Defendants' financial interests because the PBMs play a critical role in determining which medications receive favorable treatment on the lists of approved medications, or "formularies," that PBMs create for their insurer clients.

23.     When two or more branded medicines fall into the same therapeutic category and have similar effectiveness and safety profiles (as is the case with the analog insulins), a PBM is in

the position to exclude one of the medications from the PBM's formulary, or at least to place that medication in a non-preferred position on the formulary.

24.     When a drug is excluded from a formulary or placed in a non-preferred position, health insurers using that formulary will make their plan beneficiaries shoulder a greater percentage, or all, of the disadvantaged product's cost.

25.     As a result, in the branded analog insulin therapeutic category, the PBM Defendants can employ formulary placement to push a significant volume of sales toward or away from particular products.

26.     In a well-functioning, non-fraudulent market for products like the Manufacturer Defendants' analog insulins, the PBM Defendants would exercise the leverage they possess by virtue of their role in creating formularies to negotiate real price discounts from drug manufacturers, including the Manufacturer Defendants.

27.     In other words, the PBM Defendants should negotiate discounts or rebates that lower the manufacturers' net selling prices and then use those reductions as legitimate bases to confer formulary status to the least costly medication.

28.     Throughout the Class Period, however, Defendants employed their Price Inflation Schemes to increase WAC prices, which lead to higher AWP prices, which lead to increases in the spread discussed herein.

29.     As a quid pro quo for Defendants' assistance, the PBM Defendants provided the Manufacturer Defendants with favorable formulary placements for their analog insulins that served to maintain the enormous profits that the Manufacturer Defendants generated from those medications.

30.     Throughout the Class Period, each Manufacturer Defendant incrementally raised its WAC prices, leading to higher AWP prices that were just slightly more than its competitors while making roughly equivalent offsetting payoffs to the PBM Defendant in each enterprise.  That tactic induced the PBM Defendants to keep the insulin manufactured by the Manufacturer Defendants generating the largest spreads on the PBM Defendants' formularies or in a preferred formulary position.

31.     In effect, the Price Inflation Schemes allowed the Manufacturer Defendants to trade the inflated AWP prices (via inflated WAC prices) that enhanced the PBM Defendants' bottom lines for the preferred formulary positions that augmented the Manufacturer Defendants' profits.

32.     As a result, formulary decisions for analog insulins are increasingly made based on inflated AWP prices (and corresponding spread inflation) that pad the PBM Defendants' profits.

33.     Defendants' conduct caused Plaintiff and members of the Classes to pay considerably higher prices.

34.     Unbeknownst to members of the Classes, the Manufacturer Defendants utilized a substantial portion of the payments received from Plaintiff and members of the Classes to fund the kickbacks, i.e., rebates, to the PBM Defendants that were required to maintain favorable formulary positions.

35.     Over time, the Manufacturer Defendants have engaged in an arms race of false price increases to the detriment of Plaintiff and members of the Classes.

36.     Between 2014 and 2019, for example, the Manufacturer Defendants raised the AWP prices for their analog insulins by over 150% by raising WAC prices first.

8

37.     Because of Defendants' Price Inflation Schemes, the Direct Purchaser Prices paid by Plaintiff and members of the Classes to purchase the Manufacturer Defendants' analog insulins experienced similar unjustifiable growth.

38.     Those dramatic increases have occurred despite the absence of *any* change in the Manufacturer Defendants' analog insulins.

39.     The Manufacturer Defendants' false representations about prices defrauded Plaintiff and members of the Classes, who had no reason to believe that the Direct Purchaser Prices that Defendants quoted were inflated to fund the kickback payments to the PBM Defendants.

40.     Likewise, because the Manufacturer Defendants repeatedly announced their fraudulently inflated WAC prices for analog insulin publicly, Plaintiff and members of the Classes reasonably believed that the Direct Purchaser Prices were reasonable and fair approximations of the actual cost of their analog insulins.

41.     Had Defendants published prices that reasonably approximated their analog insulins' true costs, Plaintiff and members of the Classes would have paid much less for the analog insulins they purchased.

42.     Plaintiff and members of the Classes' damages therefore arise as a direct and proximate result of Defendants' Price Inflation Schemes, which they perpetrated through acts of mail and wire fraud that amount to a pattern of racketeering activity under the federal RICO and New Jersey RICO statutes.

43.     During the Class Period, Defendants employed the RICO enterprises that they formed to enrich themselves at the expense of Plaintiff and members of the Classes who paid for their analog insulins based on the fraudulently inflated Direct Purchaser Prices.

44.     Pursuant to the terms of those statutes, Defendants are liable to Plaintiff and members of the Classes for damages, treble damages, and the costs and attorneys' fees incurred in prosecuting this action.

## II.  JURISDICTION AND VENUE

45.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1965, Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.  Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

46.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 , 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, Defendants: (a) resided in this District; (b) transacted business in the United States, including in this District; (c) were found in this District; and (d) maintained agents here.

47.     Courts in this District are already adjudicating parallel class action litigation commenced by consumers who have sued Defendants for perpetrating their unlawful scheme to inflate analog insulin prices.  *See In re Insulin Pricing Litig*., No. 17-699 (D.N.J).

48.     During the Class Period, Defendants sold and shipped analog insulin drugs in a continuous and uninterrupted flow of interstate commerce, which included sales of analog insulin drugs in this District and throughout the United States.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

49.     Throughout the Class Period, Defendants also perpetrated their pattern of racketeering activity through their use of the U.S. mail and interstate and international wires.  This Court has personal jurisdiction over each Defendant because, *inter alia*: (a) Defendants maintain their principal places of business in this District; (b) Defendants transacted business throughout

the United States, including in this District; (c) Defendants participated in the selling and distribution of analog insulin drugs throughout the United States, including in this District; (d) Defendants had and maintained substantial contacts with the United States, including in this District; (e) Defendants were engaged in an unlawful conspiracy and were members of unlawful enterprises designed to inflate the prices for analog insulin drugs; and (f) those conspiracies and enterprises were directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.  THE PARTIES

**A.  Plaintiff**

50.  Plaintiff is a limited liability company organized under the laws of the State of Illinois, with its principal place of business located in Glen Ellyn, Illinois.  Plaintiff is the assignee of antitrust and other claims of Frank W. Kerr Co ("FWK").

51.  Based on information currently available, during the Class Period, FWK purchased approximately $113,143,774.13 of Lantus directly from Defendant Sanofi, purchased approximately $25,455,136.10 of Levemir and $64,418,385.92 of Novolog directly from Defendant Novo, and purchased approximately $45,419,536.95 of Humalog directly from Defendant Lilly.

52.  As a direct and proximate result of Defendants' unlawful conduct, FWK paid artificially inflated Direct Purchaser Prices for the NovoLog, Humalog, Lantus and Levemir that it purchased directly from Defendants.

**B.  Defendants**

53.  Defendant Novo is a Delaware corporation with its principal place of business located at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Novo is one of the largest

producers of insulin drugs in the U.S.  During the Class Period, Novo manufactured and sold NovoLog and Levemir, among other insulin drugs, to purchasers in this District and throughout the United States.

54.    Defendant Lilly is an Indiana corporation with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana 46285.  During the Class Period, Lilly manufactured and sold Humalog to purchasers in this District and throughout the United States.

55.    Defendant Sanofi is a Delaware limited liability corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.  During the Class Period, Sanofi manufactured and sold Lantus to purchasers in this District and throughout the United States.

56.    Defendant CVS Health Corporation is a corporation organized under the laws of Delaware and headquartered at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers with Novo Nordisk, Eli Lilly, and Sanofi for purchase of the analog insulin medications these pharmaceutical companies make.

57.    Defendant Caremark Rx, LLC is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management subsidiaries. Caremark Rx, LLC is a subsidiary of Defendant CVS Health Corporation. Defendant Caremark Rx, Inc. is a corporation organized under the laws of Delaware and headquartered at 211 Commerce Street, Suite 800 Nashville, Tennessee 37201. Caremark Rx, Inc. is an immediate or indirect parent of many subsidiaries, including pharmacy benefit management subsidiaries, and a subsidiary of Defendant CVS Health Corporation. Collectively,

Defendant CVS Health Corporation, Defendant Caremark Rx, LLC and Defendant Caremark Rx, Inc. are referred to as "CVS Health."

58.     Defendant Express Scripts Holding Company is a Delaware corporation. Its principal place of business is at 1 Express Way, St. Louis, Missouri 63121.

59.     Defendant Express Scripts, Inc. is a corporation organized under the laws of Delaware and headquartered at 1 Express Way, St. Louis, Missouri 63121. Express Scripts is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers with Novo Nordisk, Eli Lilly, and Sanofi for purchase of the analog insulin mediations these pharmaceutical companies make.  Defendant Express Scripts, Inc. is a subsidiary of Defendant Express Scripts Holding Company.  Defendant Express Scripts, Inc., and Defendant Express Scripts Holding Company are collectively referred to as "Express Scripts."

60.     Defendant UnitedHealth Group, Inc. ("UnitedHealth") is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343. UnitedHealth is a diversified managed healthcare company.  UnitedHealth offers products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.

61.     Defendant OptumRx, Inc. is a corporation organized under the laws of California and headquartered at 2300 Main St., Irvine, California 92614. OptumRx is a pharmacy benefit manager and, as such, contracts on behalf of health plans and insurers with Novo Nordisk, Eli Lilly, and Sanofi for purchases of the analog insulin medications these pharmaceutical companies make.  Collectively, Defendant OptumRx and Defendant UnitedHealth are referred to as "OptumRx."

62.     Defendants have engaged in the conduct alleged in this Complaint, and/or the Defendants' officers, agents, employees or representatives have engaged in the alleged conduct while actively involved in the management of Defendants' business and affairs and acting within the scope of their employment.

63.     Upon information and belief, various other companies and individuals, not named as Defendants in this Complaint, may have participated as co-conspirators in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of such conspiracy.

64.     The true names and capacities, whether individual, corporate, associate or representative is unknown to Plaintiff at this time.  Plaintiff may amend this Complaint, as necessary, to allege the true names and capacities of additional co-conspirators as their identities become known through discovery.

65.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs

## IV. FACTUAL ALLEGATIONS

### A.     The Prevalence of Diabetes in the U.S.

66.     Diabetes is an increasingly common disease in the U.S. that occurs in patients who have a lack of insulin production or an inability to respond to insulin.

67.     Insulin, which regulates metabolic processes in the body, is created by the pancreas. Insulin enables cells in the body to absorb glucose from the blood.  Glucose serves as energy for cells or is converted to fat for storage.  Insulin also regulates the breakdown of fat and protein.

68.      As of 2014, more than 29 million people in the U.S. had Type 1 or Type 2 diabetes.[2]

69.      Approximately 95% of people in the U.S. with diabetes have Type 2.[3]  A non-diabetic with high blood sugar levels may develop Type 2 diabetes.  Type 2 diabetes, formerly known as adult-onset or noninsulin-dependent diabetes, is more common in adults and occurs when a patient's body becomes resistant to insulin or when the pancreas stops producing enough insulin.

**B.      The Development and Importance of Analog Insulin Medications.**

70.      Analog insulin dominates the insulin market in the U.S. today.

71.      Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas.  As a result, insulin analogs provide increased treatment options.

72.      The American Diabetes Association (the "ADA") publishes standards of medical care in diabetes.[4]  The ADA recommends insulin analogs for both Type 1 and Type 2 diabetes patients.

73.      Physicians uniformly prescribe analog insulins for Type 1 patients.  Analog insulin is considered the most convenient initial insulin regimen by the ADA for Type 2 diabetes patients, and physicians prefer to prescribe analog insulins for Type 2 patients.

---

[2]      *See About Diabetes*, Centers for Disease Control and Prevention, CDC.GOV, https://www.cdc.gov/diabetes/basics/diabetes.html.

[3]      *See Infographics*, American Diabetes Association, DIABETES.ORG, http://diabetes-new.pub30.convio.net/diabetes-basics/statistics/infographics.html?loc=db-slabnav.

[4]      *See* "American Diabetes Association Standards of Medical Care in Diabetes – 2017", THE JOURNAL OF CLINICAL AND APPLIED RESEARCH AND EDUCATION, DIABETES CARE®, *available at* http://care.diabetesjournals.org/content/diacare/suppl/2016/12/15/40.Supplement_1.DC1/DC_40_S1_final.pdf.

74.     In 2010, 91.5% of adults who filled more than one prescription for insulin did so with insulin analogs.

75.     Due to the advantages of insulin analogs, sales of human insulin products, such as Novolin and Humulin, have dropped drastically.

76.     IMS data[5] for 2016 show that the three top-selling insulins in the U.S. were analogs. Sanofi's long-acting Lantus produced $8.87 billion in sales.   Novo's long-acting Levemir produced $1.82 billion in U.S. sales in 2016.   Other analog insulins also posted blockbuster sales. During 2016, Novo's NovoLog produced $5.86 billion in sales, and Lilly's rapid-acting Humalog produced $5.88 billion in sales.

### C.     Analog Insulin Brands Are Therapeutically Interchangeable.

77.     The long-acting analog insulins Lantus and Levemir are very similar drugs with few differences that impact treatment.   While not classified as generics of each other, they are generally considered to be therapeutically interchangeable.

78.     Both Lantus and Levemir are available in vial and cartridge delivery forms and are suitable for once-daily administration.

79.     Likewise, the rapid-acting insulins NovoLog and Humalog appear to have identical effects in diabetes patients.   Thus, NovoLog and Humalog also are considered therapeutically interchangeable.

80.     Studies show that there is no meaningful difference in the effectiveness of Levemir versus Lantus, or Humalog versus NovoLog.   The FDA has stated that, in certain circumstances,

---

[5]     IMS data is provided by IMS Health, Inc. ("IMS Health") (n/k/a IQVIA).   IMS Health collects pricing data from retail pharmacies, including independents, chains, and pharmacies within food stores or mass merchandisers,

one brand of rapid-acting insulin may be substituted for another brand of rapid-acting insulin and that one brand of long-acting insulin may be substituted for another brand of long-acting insulin.[6]

81.     Generally, diabetes patients can easily switch insulin brands.  In most states, a physician does not need to write a new prescription for a patient to switch insulin brands.

### D.     The Participants in the Distribution and Sale of Pharmaceutical Products.

82.     The critical players in the prescription drug industry include pharmaceutical companies, direct purchasers, pharmacies, health benefit providers (such as institutional insurers, self-insured employers, and health and welfare plans), Pharmacy Benefit Managers ("PBMs"), and patient-consumers.

83.     **Pharmaceutical Companies.**  Pharmaceutical companies own the rights to manufacture and market drugs.  Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to the distributors, like Plaintiff and other direct purchasers, such as retail pharmacies.  Pharmaceutical companies set the prices of their drugs.

84.     **Direct Purchasers.**  After production, pharmaceutical companies send their drugs to direct purchasers such as FDA-registered drug distributors, like Plaintiff and retail pharmacy outlets. Defendants establish the Direct Purchaser Prices at which Plaintiff and members of the Classes purchase drugs from the manufacturers.

85.     Drug manufacturers typically send Plaintiff and members of the Classes notifications regarding new Direct Purchaser Prices via the U.S. mail, electronic mail or interstate wires.

---

[6]     *See Information Regarding Insulin Storage and Switching Between Products in an Emergency*,   Federal   Drug   Administration,   FDA.ORG, https://www.fda.gov/drugs/emergencypreparedness/ucm085213.htm.

86. During the Class Period, the Direct Purchaser Prices that Plaintiff and members of the Classes were paid for pharmaceuticals were set by the pharmaceutical companies.

87. **Health benefit providers.** Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans. Health benefit providers submit payments on behalf of insured individuals to healthcare providers (doctors and medical facilities) for services rendered to the insured individuals. Health insurers also cover a portion of their beneficiaries' drugs costs, submitting payments to pharmacies on behalf of their members. The term "health insurers" includes public and private entities, the latter of which includes self-insured businesses, insurance companies, union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits.

88. **Pharmacy Benefit Managers**. PBMs effectuate financial and contractual arrangements between drug manufacturers, pharmacies, and health insurers. PBMs perform a variety of services on behalf of their health insurer clients, including negotiating prices with drug companies, creating formularies, managing prescription billing, constructing retail pharmacy networks for insurers, and providing mail-order services.

89. PBMs generally are not a direct link in the physical supply chain for pharmaceutical products. That is, in most instances, PBMs do not take possession or control of prescription drugs.

90. Business is booming for the PBMs. Together, they bring in more than $200 billion a year in revenue. They also control over 80% of the PBM market, covering 180 million insured people.

### E.    The Drug Payment and Distribution Structure.

91. Figure 1 below illustrates the drug payment structure.

**Figure 1: The U.S. Drug Payment Structure[7]**



**F.     The Defendants Have Consistently and Dramatically Increased Analog Insulin Prices in Lockstep to the Detriment of Plaintiff and Members of the Classes.**

92.     The Defendants have dramatically increased analog insulin prices in lockstep. National Drug Acquisition Costs ("NADAC") data demonstrates that NovoLog, Humalog, Lantus, and Levemir prices have moved in lockstep since 2012.

---

[7]    Allison Tsai, The Rising Cost of Insulin, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/ 2016/mar-apr/rising-costs-insulin.html.

93.     Although drug companies usually rely on their research and development costs or purported improvements in the "clinical benefits" of their drugs to rationalize high pharmaceutical prices, the Defendants' analog insulin price hikes are unrelated to those factors.

94.     In fact, the clinical benefits of these medications have not changed for many years. For example, Levemir and Novolog are the exact same drugs they were 10 years ago, but the Defendants continue to increase the Direct Purchaser Prices and AWP prices of those drugs dramatically every year.

95.     The actual cause of the rapidly escalating Direct Purchaser Prices and AWP prices is Defendants' unlawful scheme to artificially increase prices.

96.     By the end of 2017, Lilly had raised the AWP prices of Humalog to $663.00 for a package of pens and $343.38 for a box of cartridges.  Figure 2 demonstrates Lilly's price increases from 2006 to 2019 for Humalog.

**Figure 2: Rising AWP prices of Humalog vials and pens from 2006-2019**



97.     Novo's AWP prices (AWP) for Levemir were $504.38 for a package of pens at the end of 2017 and $367.19 for a vial at the end of 2018.  Novo's AWP prices for Novolog sat at $698.54 for a package of pens and $361.70 for a vial at the end of 2018.

98.     Figures 3 and 4 demonstrate Novo's price increases from 2006 to 2019 for Levemir and Novolog.

**Figure 3: Rising AWP prices of Levemir vials and pens from 2006-2019**



**Figure 4: Rising AWP prices of Novolog vials and pens from 2006-2019**



99.     At the end of 2018, Sanofi's AWP prices for Lantus, the top-selling analog insulin, was $505.36 for a package of pens and $336.93 for a vial.

100.     Figure 5 demonstrate Sanofi's price increases from 2006 to 2019 for Lantus vial and pen packages.

**Figure 5: Rising AWP prices of Lantus vials and pens from 2006-2019.**



101.    In just five years, Sanofi and Novo raised the reported prices for Lantus and Levemir by 168% and 169%, respectively.

102.    In 2016, Novo and Sanofi were responsible for the highest drug AWP price increases in the pharmaceutical industry.  This distinction largely reflected their lockstep price hikes for Lantus and Levemir.

103.    Figure 6 shows the dramatic analog insulin lockstep price hikes imposed by Lilly, Novo, and Sanofi from 2000 to 2015.

**Figure 6: Rising insulin AWP prices from 2000-2015[8]**



104.    The absence of competition among the analog insulin manufacturers is illustrated by the fact that Lilly, Novo, and Sanofi have not only dramatically increased their products' prices in the last 10 years, but also levied those increases in perfect lock-step.

105.    In thirteen instances since 2009, Sanofi and Novo raised the prices of their long-acting analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the decimal point within a few days of each other."  Robert Langreth, "Hot Drugs Show Sharp Price Hikes in Shadow Market," Bloomberg (May 6, 2015).

106.    As the same report states, "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."

107.    Lilly and Novo have engaged in the same lock-step behavior with respect to their rapid-acting analog insulins, Humalog and NovoLog respectively.

---

[8] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

108.    Figure 7 demonstrates this seemingly collusive behavior with respect to Lantus and Levemir.  Figure 8 demonstrates this collusive pattern of lockstep price hikes with respect to NovoLog and Humalog.

**Figure 7: Rising Lantus and Levemir AWP prices from 2001-2015[9]**



---

[9] Lydia Ramsey, A 93-Year-Old Drug That Can Cost More Than a Mortgage Payment Tells Us Everything That's Wrong with American Healthcare, Business Insider (Sept. 16, 2016), http://www.businessinsider.com/insulin-prices-increase-2016-9.

**Figure 8: Rising Humalog and Novolog AWP prices from 1996-2016[10]**



109.    National Drug Acquisition Cost ("NADAC") data confirms that NovoLog and Humalog prices and Lantus and Levemir prices have increased in lockstep since 2012.  NADAC data is compiled by the Centers for Medicare and Medicaid Services and is based on a survey of retail community pharmacy prices.

110.    According to the NADAC data, between 2012 and 2017, NovoLog prices increased 104%, Humalog prices increased 107%, Lantus prices increased 101%, and Levemir prices increased 121%.

---

[10] *Id.*

111.    The following chart (Figure 9) demonstrates the lockstep price increases shown in NADAC data per milliliter (ML) for NovoLog and Humalog 100 unit/10 ML vials between 2012 and 2017.

**Figure 9: Price Increases for NovoLog and Humalog 2012-2017**



112.    Figure 10 demonstrates the lockstep price increases shown in NADAC data per milliliter (ML) for Lantus and Levemir 100 unit/10 ML vials between 2012 and 2017.

**Figure 10: Price Increases for Lantus and Levemir 2012-2017**



113.    IMS Health data likewise confirms that, between 2009 and 2017, NovoLog and Humalog, and Lantus and Levemir followed the same pattern of lockstep price increases.  During that period, NovoLog prices increased 207.21%, Humalog prices increased 206.6%, Lantus prices increased 184.33%, and Levemir prices increased 203.78%.

114.    The following chart (Figure 11) demonstrates the lockstep price increases per milliliter (ML) shown in IMS Health data for NovoLog and Humalog 100 unit/10 ML vials from January 2009 through June 2017.

29

**Figure 11: Price Increases for NovoLog and Humalog Jan. 2009 – June 2017**



115.    Figure 12 demonstrates the lockstep per milliliter (ML) price increases shown in

IMS Health data[11] for Lantus and Levemir 100 unit/10 ML vials from January 2009 through June

2017.

---

[11]    The IMS Health data graphed here is the total amount of the sales for chain stores by
month reported by IMS divided by the extended unit sales in that same month reported by IMS.
Extended units are the number of tablets, capsules, milliliters, ounces, etc. of a product shipped in
each unit.  Extended units are calculated by multiplying the number of units by the product size.

**Figure 12: Price Increases for Lantus and Levemir Jan. 2009 – June 2017**



116.    Like the retail prices of the Defendants' analog insulins, the Direct Purchaser Prices for those medications have increased in lockstep as the Defendants continually increased prices throughout the Class Period.

117.    Figure 13 demonstrates the Direct Purchaser (or WAC) Price increases shown in IMS Health data for NovoLog and Humalog 100 unit/10 ML vials between July 2011 and May 2017.  These price increases demonstrate the tethered relationship between the Direct Purchaser Price and the inflated AWP prices.

**Figure 13: Price Increases for NovoLog and Humalog Jul. 2011 – May 2017**



118.    The Direct Purchaser Prices of Lantus and Levemir have likewise increased.  The following chart (Figure 14) demonstrates the lockstep Direct Purchaser Price increases shown in IMS Health data for Lantus and Levemir 100 unit/10 ML vials between July 2011 and May 2017.  These price increases demonstrate the tethered relationship between the Direct Purchaser Price and the inflated AWP prices.

**Figure 14: Price Increases for Lantus and Levemir Jul. 2011 – May 2017**



119.    General economic theory predicts that, given the expiration of most of the patents covering analog insulin compounds and competition among competitors, the expectation is that prices would be competitive.  Further, when there are different, equally interchangeable versions of a drug available, prices should remain at competitive levels, including decreasing in price. Raising prices in a competitive market is contrary to the best interests of the company and, absent collusion, would result in loss of market share. In a competitive market, the prices would not increase as they did here, absent anticompetitive conduct.

120.    As a result of unlawful agreements among Defendants to increase pricing and restrain competition for the sale of insulin analogs in the U.S., Defendants Eli Lilly and Novo substantially increased the price of NovoLog and Humalog, and Defendants Sanofi and Novo substantially increased the price of Lantus and Levemir.

121.    Defendants control the entire analog insulin market. The only analog insulin generics, which have only recently become available, are manufactured and sold by the Defendants. In fact, in a belated and ineffective effort to control the public relations fiasco arising out of their pricing practices, Defendants repackaged Lantus and Novolog respectively as generic insulin products.

122.    There are no insulin generics on the market manufactured by any company other than the Defendants, and the Defendants can charge supra-competitive and monopolistic prices for Lantus, Levemir, Novolog, and Humalog.  Defendants are exploiting their market dominance while they have the chance.  Eventual market entry by other manufacturers of insulin generics will significantly eat into Defendants' profits.

123.    Prices for Defendants' insulin analog products continually increased without justification, in a departure from the usual industry practices and contrary to competitive market forces.  The cost or availability of raw materials does not justify the price increase.  The increased prices were not associated with any related increase in manufacturing costs.

124.    Drug shortage reports for the time period do not list the active ingredients for the analog insulin products at issue in this complaint as being in short supply: (1) NovoLog (insulin aspart); (2) Humalog (insulin lispro); (3) Levemir (insulin detemir); and (4) Lantus (insulin glargine).[12] None of the Defendants reported any drug shortages or supply issues in explanation for the supra-competitive pricing of NovoLog, Humalog, Levemir, and Lantus.

---

[12]    *See FDA Drug Shortages*, U.S. Food & Drug Administration, FDA.GOV, *available at* http://www.accessdata.fda.gov/scripts/drugshortages/default.cfm#P; *see also Current Drug Shortages*, American Society of Health-System Pharmacists, ASHP.ORG, *available at* http://www.ashp.org/shortages.

125.     Because there were no justifications, such as supply shortages attributable to higher raw material costs, raw material shortages, or manufacturing bottlenecks, competition among manufacturers of insulin analogs should have resulted in lower prices.  Instead, prices increased after the Defendants unlawfully colluded to raise prices.

126.     In the case of Plaintiff and the members of the Classes, those higher prices equaled the Defendants' artificially inflated WAC prices.

### G.  The Defendants Employed Their Massive WAC and AWP Price Increases to Pay for Preferred Formulary Status.

127.     Defendants conspired with Pharmaceutical Benefits Managers ("PBMs") to unlawfully drive up the "Wholesale Acquisition Price" or "WAC" price of the analog insulin drugs.  WAC or some price derived from WAC is the price paid by Plaintiff and members of the Classes for the analog insulin drugs ("Direct Purchaser Prices"). A rising WAC, in turn, unlawfully drove up the "Average Wholesale Price" ("AWP") for these same drugs paid by consumers farther down in the stream of commerce.  The WAC and AWP price are mathematically tethered together. As AWP pricing goes up, so does WAC pricing, and vice versa.

128.     PBMs manage prescription medication benefits for health insurers, among others. The PBMs, specifically, are responsible for managing the prescription medication benefits maintained by approximately 180 million Americans, or 80% of the insured public.

129.     PBMs fulfill their role by negotiating directly with the Defendants on behalf of health insurers to determine the real retail prices of analog insulins and other pharmaceuticals.

130.     In theory, the PBMs efforts are supposed to reduce the price of analog insulin. However, Defendants agreed to willfully participate in a pricing scheme that paid PBMs kickbacks, or rebates, in exchange for favorable treatment on the lists of approved medications or "formularies," that PMBs create for their insurer clients. As a result, Defendants drove up the price

of analog insulin. This conspiracy among the Defendants and the PBMs is referred to herein as the "kickback scheme."

131.    The Defendants pay the PBMs kickbacks, or "rebates," from the difference between the Defendants published WAC prices and the net selling prices secretly agreed upon by the Defendants and the PBMs.   The money paid by Plaintiff and members of the Classes to the Defendants for inflated WAC prices is used to pay these kickbacks, or "rebates."

132.    The spread was significant to the Defendants because it determined the amount of the kickback that the Defendants would pay to the PBMs.

133.    By improperly inflating WAC and AWP prices of their analog insulins, the Defendants provided the PBMs with significantly greater kickbacks.

134.    When a Defendant enlarges the spread between a drug's WAC/AWP and net price in order to pay higher kickbacks, Plaintiff and members of the Classes are forced to pay the higher prices.

135.    In a well-functioning, competitive market for products like the Defendants' analog insulins, PBMs would exercise the leverage they possess by virtue of their role in creating formularies to negotiate lower prices from drug manufacturers, including the Defendants.

136.    In turn, the Defendants would compete by providing the lowest price in order to obtain a favorable position on the formulary.

137.    In other words, a competitive price would provide a legitimate basis to confer formulary status to the least costly medication.

138.    Throughout the Class Period, the Defendants colluded and conspired to increase WAC and AWP prices in lockstep, which led to increases in the spread discussed herein.

139.     Formulary decisions for analog insulins are increasingly made based on inflated WAC and AWP prices paid by the Defendants. Defendants concluded to create and participate in the kickback scheme alleged herein.

140.     During the Class Period, the Defendants deliberately and intentionally colluded and agreed to inflate the WAC and AWP prices for their analog insulins that did not reflect the actual, market prices of those drugs.

141.     Instead of competing based on the prices offered to Plaintiff and members of the Classes, the Defendants agreed instead to offer kickbacks, or rebates, to the PBMs in exchange for preferred formulary status.

142.     PBMs possess significant leverage when two or more drug companies manufacture drugs that are in the same therapeutic class and are perceived to have similar efficacy and risk profiles, as is true of analog insulins.

143.     Based in part on the prices they secure, the PBMs set up tiered formularies for their clients, who are principally health insurance companies.

144.     Formularies are ranked lists of drugs, where cheaper and more effective medicines are generally placed into lower tiers.  The health insurers rely on these formularies to determine how much of their members' drug costs they will cover.  Drugs in lower, preferred formulary tiers are cheaper for plan members.

145.     As a result, the PBM formularies enabled them to push patients toward certain brands of drugs over others, giving them enormous control over drug purchasing behavior.

146.     Where two or more drug manufacturers make largely interchangeable products, those companies would, in a truly competitive market, compete for formulary access by continually lowering their real prices.

147.    The Defendants increased Direct Purchaser Prices of analog insulins and passed along the costs of the kickbacks they pay to be on the PBMs' formulary.

148.    The Defendants' "rebate," arrangements with the PBMs are purportedly intended to create an incentive for the PBMs to negotiate lower real drug prices.

149.    The "discounts" the PBMs supposedly obtain from the Defendants are actually reductions off artificially inflated prices.  In other words, these "discounts" are not discounts at all.

150.    The Defendants employ this tactic to secure preferred formulary positions from the PBMs and, as a result, the business of the PBMs' clients.

151.    The inflated Direct Purchaser Price and AWP price increases do not cost the PBMs anything.

152.    As a result of Defendants collusion, Defendants' analog insulin prices dramatically increased in lockstep without impacting the net retained by the Defendants after rebates/kickbacks.

153.    For example, Novo has steeply raised the AWP prices of Levemir and Novolog for over a decade, while keeping the net prices of these drugs medicines constant.  Figures 15 and 16, which were attached to Novo's November 30, 2016 press release, illustrate this conduct.

**Figure 15: Real Versus AWP Prices of Novolog Vials[13]**



**Figure 16: Real Versus AWP Prices of Novolog FlexPens[14]**



154.          Figure 17 illustrates Sanofi's manipulation of the Lantus spread.

---

[13] Novo Nordisk Press Release (Nov. 30, 2016), *available at* https://www.novonordisk-us.com/perspectives/our_perspectives.html.
[14] *Id.*

**Figure 17: Real versus AWP Price of Lantus[15]**



155.   The Defendants' manipulation of their analog insulin prices with the rebates to PBM co-conspirators is also evidenced by data concerning the amount of the Defendants' "rebates" to PBMs and insurers.

156.   Figure 18 shows the amount Lilly Novo has increased its rebates (spreads) from 2007 to 2014.

---

[15] *See* William T. Cefalu, *et al.*, *Insulin Access and Affordability Work Group: Conclusions and Recommendaitons*, 41 DIABETES CARE 1306 (June 2018), *available at* https://care.diabetesjournals.org/content/diacare/41/6/1299.full.pdf.

**Figure 18: Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014[16]**



Figure 45: **Reported rebates as % of US Gross sales**

Source: Company data, Credit Suisse estimates

157.    The spreads on Novo's analog insulins have exhibited the same pattern.  Figure 19 shows the increase in Novo's rebates (spreads) from 2007 to 2014.

---

[16] *See* Jeffrey Balin, *et al.*, *Global Pharma: Rising US Rebates Limit Margin Expansion*, CREDIT SUISSE, 23 (May 1, 2015).

**Figure 19: Novo's reported "rebates" as a percentage of U.S. gross sales from 2007-2014[17]**



Source: Company data, Credit Suisse estimates

158.    Sanofi's spreads have also exhibited the same pattern.  Figure 20 shows the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

---

[17] *Id.*

**Figure 20: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014[18]**



Figure 81: **Reported rebates as % of US Gross sales**

Source: Company data, Credit Suisse estimates

159.    The spreads that Sanofi and Novo employ with respect to their analog insulin medications have made the Defendants the second and third largest rebators in the pharmaceutical industry.

160.    The Defendants are exploiting their market dominance with the PBM co-conspirators to artificially maintain and enhance their profits at the expense of Plaintiff and members of the Classes by agreeing to artificially inflate Direct Purchaser Prices to pay kickbacks to the PBMs.

161.    Defendants' unlawful conduct alleged herein allows the Defendants to avoid pressure from the PBMs to lower the actual prices of analog insulins.

162.    In the absence of an unlawful agreement, the Defendants would compete based on price, and the Direct Purchaser Prices paid by Plaintiff and members of the Classes would be lower.

---

[18] *Id.* at 26.

163.    Defendants reap substantial financial benefits from their scheme to unlawfully increase analog insulin prices.

164.    As a result of Defendants' conclusive and unlawful conduct, Plaintiff and members of the Classes paid supra-competitive prices for analog insulin during that time period.

165.    Plaintiff and the members of the Classes are direct purchasers of the Defendants' analog insulins.  As a result, they were the most directly harmed victims of Defendants' unlawful actions alleged herein.

### H.    The Government Investigations of Insulin Pricing.

166.    On November 3, 2016, Senator Bernie Sanders and Representative Elijah E. Cummings sent correspondence to U.S. Attorney General Loretta Lynch and the Chair of the Federal Trade Commission ("FTC"), Edith Ramirez, requesting that the U.S. Department of Justice ("DOJ") and the FTC "investigate whether pharmaceutical companies manufacturing insulin products have colluded or engaged in anticompetitive behavior in setting their drug prices."[19]

167.    The Congressmen noted that, although the original insulin patent expired 75 years ago, drug prices were not falling.  Rather, the three Defendants were continuously increasing prices.[20] Further, "[i]n numerous instances price increases have reportedly mirrored one another

---

[19]    *See* Letter from U.S. Senator Sanders and U.S. Representative Cummings to U.S. Attorney General Loretta Lynch and FTC Chair Edith Ramirez (November 3, 2016), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter-to-doj-ftc-on-insulin?inline=file.

[20]    *Id.* (citing Carolyn Johnson, *Why Treating Diabetes Keeps Getting More Expensive*, WASHINGTON POST (Oct. 31, 2016) and Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, BLOOMBERG (May 6, 2015)).

precisely."[21]

168.    According to the Congressmen's letter, "[t]he price of insulin more than tripled between 2002 and 2013 – from $231 to $736 per year per patient.  From 2010 to 2014, Lantus, made by Sanofi, increased in price by 168 percent; Humalog, made by Eli Lilly, increased by 103 percent."[22]

169.    The Congressmen noted the following specific price increases reported by Bloomberg in 2015:

> On May 30 last year, the price for a vial of the blockbuster diabetes medication Lantus went up by 16.1 percent.  On the next day, Lantus's direct competitor, Levemir, also registered a price increase—of 16.1 percent.
>
> The pattern repeated itself six months later when Lantus, from French drugmaker Sanofi, was marked up 11.9 percent, and Levemir, made by Novo Nordisk A/S, matched again exactly.
>
> **In 13 instances since 2009, prices of Lantus and Levemir**—which dominate the global market for long-acting injectable insulin with $11 billion in combined sales—**have gone up in tandem in the U.S.**, according to SSR Health, a market researcher in Montclair, New Jersey.[23]

170.    For more than a year, beginning on or about June 2017, Representatives Diana DeGette (D-CO) and Tom Reed (R-NY), the Co-Chairs of the Congressional Diabetes Caucus, conducted a bipartisan inquiry into the dramatic insulin price increases.

---

[21]    *Id.* (citing Carolyn Johnson, *Why Treating Diabetes Keeps Getting More Expensive*, WASHINGTON POST (Oct. 31, 2016) and Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, BLOOMBERG (May 6, 2015)).

[22]    *Id.* (internal footnotes omitted).

[23]    *Id.* (quoting Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, BLOOMBERG (May 6, 2015)) (emphasis in original).

171.    The mission of the Congressional Diabetes Caucus is to educate Members of Congress and staff about diabetes and to support legislative activities that would improve diabetes research, education and treatment.[24]

172.    On November 1, 2018, the Congressional Diabetes Caucus published a report that provides an overview of the insulin supply chain, discusses the drivers behind rising insulin prices, and recommends policy solutions to lower costs.[25]

173.    In its report, the Congressional Diabetes Caucus found that the list price of competing insulin formulations appeared to rise in tandem, a market phenomenon some observers have called "shadow pricing." The Congressional Diabetes Caucus concluded the following:

> This phenomenon likely stems from limited market competition.  Each part of the insulin delivery chain is controlled by a small number of entities. For example, only three manufacturers produce insulin in the United States. Similarly, the three largest wholesalers control about 85 percent of the drug distribution market.  The PBM market also suffers from lack of competition with only a handful of corporations holding significant market share. This market concentration throughout each part of the insulin delivery chain precludes competitive forces typically present in other commodity markets that could exert a downward pressure on insulin prices.[26]

174.    In February and April of 2019, Senators Chuck Grassley and Ron Wyden, Chairman and Ranking Member of the Senate Finance Committee respectively, wrote the three largest drug manufacturers of insulin (Eli Lilly, Novo Nordisk, and Sanofi) and the three largest pharmaceutical benefit managers (Express Scripts, CVS, and OptumRX) in order to follow the

---

[24]     *See About the Caucus – Goals*, Congressional Caucus on Diabetes, https://diabetescaucus-degette.house.gov/about.

[25]     *See Insulin:   A   life-saving   drug   too   often   out   of   reach*,   at https://docs.house.gov/meetings/IF/IF02/20190402/109502/HHRG-116-IF02-20190402-SD001.pdf ("Congressional Diabetes Caucus Report"); *see also* https://diabetespac.org/report-on-insulin/.  .

[26]     Congressional Diabetes Caucus Report at page 11.

money trail and better understand how the three largest insulin manufactures and the three largest PBMs price their insulin products and whether PBMs have resulted in lower costs to patients.[27]

175.   In April 2019, Members of Congress held a hearing with pharmaceutical executives and pharmacy benefit managers in an attempt to address concerns of distressed constituents who are unable to afford the medicines they need and expressed frustration at large insulin price increases.

176.   At the April 2019 Congressional hearing, Novo's President, Doug Langa, testified on Novo's perpetuation of the insulin pricing conspiracy alleged herein:

> There is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [reported] prices high. And we've been participating in that system because the higher the [reported] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . . If we eliminate all the rebates . . . we would be in jeopardy of losing [Novo's formulary] positions.[28]

177.   At the same April 2019 Congressional hearing, Lilly's Senior Vice President, Mike Mason, testified:

> Seventy-five percent of our [reported] price is paid for rebates and discounts to secure [formulary position] . . . $210 of a vial of Humalog is paid for discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].

178.   On October 22, 2019, Congressman Tim Burchett (TN-02) sent a letter to Attorney William Barr urging the Department of Justice to investigate increasing insulin prices. In his letter, Rep. Burchett voiced concerns over the rising price of insulin despite the cost of production

---

[27]   *See*, *e.g.*, *Grassley, Wyden Launch Bipartisan Investigation into Insulin Prices*, GRASSLEY.SENATE.GOV, *available at* https://www.grassley.senate.gov/news/news-releases/grassley-wyden-launch-bipartisan-investigation-insulin-prices.

[28]   *Priced Out Of A Lifesaving Drug: Getting Answer On The Rising Cost Of Insulin*, Hearing Before the Subcomm. on Energy and Commerce (April 10, 2019).

remaining steady: "Increasing insulin prices at the rates we've seen and without regard to the cost of production is unethical and possibility illegal." [29]

179.    Congressional investigations remain ongoing.

180.    On July 28, 2016, Lilly disclosed that the U.S. Attorney's Office for the Southern District of New York issued a civil investigative demand for information related to contracts with, services performed by and payments to PBMs.[30]

181.    On May 1, 2017, Lilly announced in a Securities and Exchange Commission filing that it had received civil investigative demands in connection with insulin pricing investigations by the attorneys general for the states of Washington and New Mexico.[31]

182.    In a belated, ineffective effort to control the public relations fiasco arising out of its pricing practices, Lilly announced a half-price alternative to its top-selling Humalog product.[32]

183.    The attorney general for the state of Washington also sent a civil investigative demand to Sanofi regarding insulin pricing and trade practices. [33]

---

[29]    *See* October 22, 2019 Letter from U.S. Representative Tim Burchett to U.S. Attorney General William P. Barr, *available at* https://burchett.house.gov/sites/burchett.house.gov/files/2019-10-22%20SIGNED%20encouraging%20DOJ%20to%20investigate%20insulin%20prices.pdf.

[30]    2016 Form 10-Q, Eli Lilly and Company, at 45, *available at* https://investor.lilly.com/static-files/4ff44c76-ec31-44c4-a032-0691d3e2879f.

[31]    *See* 2017 Form 10-Q, Eli Lilly and Company (May 1, 2017), *available at* https://investor.lilly.com/secfiling.cfm?filingID=59478-17-129&CIK=59478.

[32]    *See* "*We Either Buy Insulin Or We Die*", N.Y TIMES. Jun. 13, 2019, *available at* https://www.nytimes.com/2019/06/13/opinion/insulin-price-costs.html.

[33]    *See* 2017 Half-Year Financial Report, at 41, Sanofi, *available at* https://www.sanofi.com/-/media/Project/One-Sanofi-Web/Websites/Global/Sanofi-COM/Home/en/investors/docs/0000-2999/2017_Half_Year_Financial_report.pdf?la=en&hash=4EB9683701B2D794B9C98A6DE56D0470.

184.    In January 2017, the attorney general for the state of Minnesota launched civil investigations into Sanofi[34]  and Novo[35]  regarding the companies' insulin pricing and trade practices.

**I.    The Defendants orchestrated their conspiracy through in-person meetings.**

185.    During the Class Period, Defendants conspired, combined and contracted to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of analog insulin, which had the intended and actual effect of causing Plaintiff and the other members of the proposed Classes to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for analog insulin.

186.    Defendants' conduct cannot be explained by normal competitive forces. It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of analog insulin in the United States. The agreement was furthered by discussion held at meetings and industry events as well as other meetings and communications.

187.    Defendants were members of trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices and engage in market and customer allocation of analog insulin, including, but not limited to conferences and events held by the Pharmaceutical Care Management Association ("PCMA") and the American Society of Health-System Pharmacists ("ASHP").

---

[34]   *See* 2016 Form 20-F, Sanofi, at 183, *available at* https://www.sec.gov/Archives/edgar/data/1121404/000119312517069257/d245496d20f.htm.

[35]   *See* 2016 Annual Report, Novo Nordisk, *available at* http://www.annualreports.com/HostedData/AnnualReportArchive/n/NYSE_NVO_2016.pdf.

188.    The Pharmaceutical Care Management Association ("PCMA") is the "national association representing America's pharmacy benefit managers (PBMs)."[36] The PCMA holds three conferences each year, the Annual Conference, the sPCM Business Forum, and a PBM Policy Forum. Before and during the Class Period, Defendants attended the Annual Conference and the sPCM Business Forum each year.

189.    The American Society of Health-System Pharmacists ("ASHP") is a professional organization that represents pharmacists who serve as patient care providers in acute and ambulatory settings.[37] ASHP's nearly "55,000 members include pharmacists, student pharmacists, and pharmacy technicians."[38]

190.    Before and during the Class Period, Defendants Lilly, Novo Nordisk, and Sanofi attended multiple PCMA Annual Conferences, sPCM Business Forums, and ASHP meetings. In addition, PBMs were also in attendance.

191.    On December 2–6, 2012, Defendants Lilly, Novo Nordisk, and Sanofi all attended and presented at the 2012 ASHP Midyear Clinical Meeting and Exhibition in Las Vegas, Nevada.

192.    On March 12 & 13, 2014, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2014 sPCM Business Forum at JW Marriott Orlando Great Lakes in Orlando, FL.

193.    On October 13 and 14, 2014, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2014 PCMA Annual Meeting together at the Terranea Resort in Ranch Palos Verdes, CA.

---

[36]    *See About*, Pharmaceutical Care management Association, PCMANET.ORG, https://www.pcmanet.org/about/.

[37]    *About ASHP*, ASHP.ORG, https://www.ashp.org/About-ASHP.

[38]    *Id.*

194.    On December 7–11, 2014, Defendants Lilly, Novo Nordisk, and Sanofi all attended and presented at the 2014 ASHP Midyear Clinical Meeting and Exhibition in Anaheim, California.

195.    On March 16 & 17, 2015, Defendants Lilly and Novo attended the 2015 sPCMA Business Forum at the Hilton Bonnet Creek in Orlando, FL.

196.    On September 21 & 22, 2015, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2015 PCMA Annual Meeting at the Broadmoor in Colorado Springs, CO.

197.    On February 8 & 9, 2016, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2016 sPCMA Business Forum held at the JW Marriott Orlando Grande Lakes in Orlando, FL.

198.    On September 19 & 20, 2016, Defendants Lilly, Novo, and Sanofi all attended and sponsored the 2016 PCMA Annual Meeting.

199.    On December 4–8, 2016 Defendants Lilly, Novo Nordisk, and Sanofi all attended and presented at the 2016 ASHP Midyear Clinical Meeting and Exhibition in Las Vegas, Nevada.

200.    On March 8 & 9, 2017, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2017 sPCMA Business Forum at the Hilton Bonnet Creek in Orlando, FL.

201.    On September 25 & 26, 2017, Defendants Lilly, Novo Nordisk, and Sanofi all attended and sponsored the 2017 PCMA Annual Meeting at the Westin Kierland in Scottsdale, AZ.

202.    On March 5 & 6, 2018, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2018 sPCMA Business Forum at the Hilton Bonnet Creek in Orlando, FL.

203.    On September 24 & 25, 2018, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2018 PCMA Annual Meeting at the Westin Kierland in Scottsdale, AZ.

204.    On March 11 & 12, 2019, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2019 sPCMA Business Forum at the Hilton Bonnet Creek in Orlando, FL.

205.    On September 23 & 24, 2019, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2019 PCMA Annual Meeting at the Westin Kierland in Scottsdale, AZ.

206.    On December 8–12, 2019, Defendants Lilly, Novo Nordisk, and Sanofi all attended the 2019 ASHP Midyear Clinical Meeting and Exhibition in Las Vegas, Nevada.

207.    As a result of these numerous interactions over the years, Defendants' employees are often aware of their competition and each other's current and future business plans. This familiarity and opportunity, on information and belief, led to agreements among competitors to fix prices or to allocate a given market, so as to avoid competing with one another on price.

208.    Further, Defendants attendance at the above conferences allowed for face-to-face meetings between Defendants and thus opportunities for communications between Defendants relating to bids and pricing strategy.

209.    During the Class Period, Defendants were also in regular communication with PBMs regarding pricing, price protection, and rebates.

210.    The Defendants raised their analog insulin prices within about one to two months after the above conferences and meetings.

J.    **Investor communications demonstrate Defendants' intent to fix and maintain supra-competitive prices to realize record profits.**

211.    Defendants' public statements and admissions in their investor communications show that Defendants realized revenue increases during the Class Period and emphasize a commitment to increasing analog insulin prices as well as maintain them at supra-competitive levels through its unlawful pricing schemes alleged herein.

212.    **Novo Nordisk**. According to Novo's 2014 Annual Report, Novo held 37% of the insulin market. In that 2014 Annual Report, Novo's Chief Executive Officer, Lars Rebien

Sorensen, also noted that "[t]wo products – Levemir® and Victoza® – accounted for more than three-quarters of [Novo's] sales growth . . . ."[39]

213.    On the issue of rebates, Novo noted that "[a] significant factor in [Novo's] net operating assets relates to movement in the provision of sales rebates in the US . . . ."[40]

214.    In Novo's 2015 Annual Report, Novo stated that North America was the main contributor to Novo's 2015 sales increases with "62% share of growth . . . ."[41] "Sales growth was realised within both diabetes care and biopharmaceuticals, with the majority of growth originating from modern insulin and Victoza."[42]

215.    Novo's 2015 Annual Report further provided that "[d]iabetes care is by far Novo Nordisk's largest business area, accounting for 79% of the company's total sales."[43]

216.    Just a year later, Novo's 2016 Annual Report disclosed:

Diabetes care is by far Novo Nordisk's largest business area, accounting for approximately 80% of the company's total sales. Since 2007, all efforts in diabetes care have been focused on protein-based products, such as insulin and GLP-1, and today Novo Nordisk is the leader in both segments, with a market share of more than 40% of the insulin market and close to 60% of the GLP-1, market measured in value.[44]

---

[39]    2014   Annual   Report   Novo   Nordisk   at   3,   *available   at* https://www.novonordisk.com/content/dam/Denmark/HQ/Commons/documents/Novo-Nordisk-Annual-Report-2014.pdf.

[40]    *Id.* at 71.

[41]    2015   Annual   Report,   Novo   Nordisk,   at   6,   *available   at* https://www.novonordisk.com/content/dam/Denmark/HQ/investors/irmaterial/annual_report/2016/20160208_Annual%20Report%202015_UK.PDF.

[42]    *Id.* at 6.

[43]    *Id.* at 16.

[44]    2016   Annual   Report,   Novo   Nordisk,   at   16,   *available   at* http://www.annualreports.com/HostedData/AnnualReportArchive/n/NYSE_NVO_2016.pdf.

217.   At the time of Novo's 2017 Annual report, diabetes care made up 81% share of Novo's sales.[45]

218.   **Eli Lilly**. According to Lilly's 2014 Annual Report, "[s]ales of Humalog, [Novo's] injectable human insulin analog for the treatment of diabetes, increased 7 percent in the U.S., driven by increased demand, partially offset by lower net effective selling prices as a result of payer contracts and greater Medicaid and Medicare utilization, as well as wholesaler buying patterns."[46] At the same time that Humalog sales increased, Lilly disclosed that "[r]esearch and development expenses decreased 14 percent . . . [and marketing], selling, and administrative expenses decreased 7 percent . . . ."[47]

219.   In its 2015 Annual Report, Lilly listed Humalog as its number one product sold. Revenues of Humalog increased 9 percent in the U.S., driven by higher realized prices and, to a lesser extent, increased volume."[48]

220.   **Sanofi**. Sanofi stated in its 2014 Annual Report that Sanofi will "generate a substantial share of our revenues from the sale of certain key products . . . . Lantus is particularly important; it was the Group's leading product . . . representing 18.8% of the Group's consolidated

---

[45]   2017   Annual   Report,   Novo   Nordisk,   at   69,   *available   at* https://www.novonordisk.com/content/dam/Denmark/HQ/investors/irmaterial/annual_report/2018/NN-AR17_UK_Online1.pdf.

[46] 2014 Annual Report, Eli Lilly and Company, at 29, *available at* https://investor.lilly.com/static-files/a536af75-8510-4315-9920-335ef3926825.

[47]   *Id.* at 30.

[48] 2015 Annual Report, Eli Lilly and Company, at 32, *available at* https://investor.lilly.com/static-files/cced98a0-c949-46fc-84de-b9e098924291.

revenues for the year. Lantus is a flagship product of the Diabetes division, one of the Group's main divisions."[49]

221.   Again, Sanofi noted in its 2015 Annual Report that "Lantus is particularly important; it was the Group's leading product . . . ."[50]

### K.   Industry commentary indicates collusion is a plausible explanation for the increase in analog insulin prices.

222.   Industry commentary suggests that collusion is a plausible explanation for the increase in analog insulin prices. For instance, Dr. S. Vincent Raijkumar at the Mayo Clinic wrote:

> The 3 main reasons cited by pharmaceutical companies for the high cost of new prescription drugs do not apply to insulin. First, the "high cost of development" is not relevant for a drug that is more than 100 years old; even the latest and most commonly used analog insulin products are all over 20 years old. Second, the pricing is not the product of a free market economy. Free market forces are clearly not operational; there is limited competition on price, the person who needs the product is not in a position to negotiate the price, and there is no relationship of price increases over time compared with overall market inflation. The price of insulin has risen inexplicably over the past 20 years at a rate far higher than the rate of inflation.[51]

223.   Another study concluded the following:

> The production costs involved in manufacturing drugs are a small portion of the total input cost. Increased costs of materials used to make drugs have a little impact on the total cost and thus do not warrant continual price hikes.  Moreover, research and development costs are considered fixed or sunk costs and therefore cannot be used to justify subsequent price increases, since the research and development has already occurred.[52]

---

[49]   2014 Form 20-F, Sanofi, at 8, *available at* https://www.sanofi.com/-/media/Project/One-Sanofi-Web/Websites/Global/Sanofi-COM/Home/en/investors/docs/S-Z/Sanofi_20-F_2014.pdf.

[50]   *Id.*

[51]   S. Vincent Rajkumar, MD, *The High Cost of Insulin in the United States: An Urgent Call to Action*, 95 Mayo Clinic Proc. 22-28 (2020), *available at* https://www.mayoclinicproceedings.org/article/S0025-6196(19)31008-0/fulltext.

[52]   Gerard F. Anderson, *It's Time to Limit Drug Price Increases*, HEALTHAFFAIRS (July 25, 2019), *available at* https://www.healthaffairs.org/do/10.1377/hblog20190715.557473/full/.

224.    On October 26, 2018, the American Medical Association ("AMA") wrote a letter to the Federal Trade Commission ("FTC") urging the FTC to "monitor insulin pricing and market competition and recommend enforcement action against manufacturers that engage in anticompetitive actions to the U.S. Department of Justice."[53] In the AMA Letter to the FTC, the AMA noted that "physicians have become increasingly concerned that the rapid rise in the price of insulin for patients is unrelated to the actual costs of research, development, commercialization, or production. Instead, physicians are concerned that anticompetitive factors may be present in the market for insulin."

## V.   THE ANALOG INSULIN MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

225.    Factors necessary to show that a market is susceptible to collusion are present in this case:  (1) high degree of industry concentration; (2) barriers to entry; (3) demand inelasticity; (4) lack of substitutes; (5) high degree of interchangeability; and (6) absence of competitive sellers.

226.    The market for analog insulin is highly concentrated and dominated by Defendants, which control the entire market for analog insulin.

227.    There are significant barriers to entry in the analog insulin market.  Costs of manufacture, intellectual property, and expenses related to regulatory oversight are high barriers to entry in the brand name drug market.  Barriers to entry increase the market's susceptibility to a coordinated effort among the dominant entities in the industry to maintain supra-competitive prices.

---

[53]    October 26, 2018 Letter from James L. Madara, MD, American Medical Association to Chairman Joseph J. Simons, Federal Trade Commission, *available at* https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTER S%2F2018-10-26-Letter-to-Simons-at-FTC-re-Insulin.pdf.

228.   Analog insulin sales operate in an inelastic market. In an inelastic market, an increase in price results in a relatively small decline or no decline in demand for the product despite the price increase, because of the need for the product and the lack of substitutes. Analog insulin is a necessary treatment for millions of diabetes patients.

229.   Millions of diabetes patients depend on the analog insulin medications marketed and sold by Defendants.  In light of the absence of competition and barriers to the market, many patients are unable to substitute cheaper medications for Defendants' analog insulin products.

230.   Defendants have maintained supra-competitive pricing for analog insulin products during the Class Period.

## VI.    INTERSTATE TRADE AND COMMERCE

231.   As described herein, during the Class Period, Defendants, directly or through one or more of their affiliates, sold analog insulin drugs throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

232.   The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

233.   Defendants' and their co-conspirators' conduct, including the marketing and sale of analog insulin drugs, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

234.   The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce as Defendants deprived Plaintiff and members of the Classes of the benefits of free and open competition in the purchase of analog insulin drugs within the United States.

235.   Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of analog insulin drugs, and their actual inflating, fixing, raising, maintaining, or artificially

stabilizing analog insulin drugs prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States and on import trade and commerce with foreign nations.

## VII.    ANTITRUST INJURY

236.    Defendants' combination and conspiracy had the following anticompetitive effects in the market for analog insulin drugs:

      a.    Competition in the market for analog insulin drugs has been reduced;

      b.    Prices for analog insulin drugs have been artificially maintained and increased despite the existence of competing manufacturers for each drug; and

      c.    U.S. purchasers have been deprived of the benefit of price competition in the market for analog insulin drugs.

237.    As described herein, during the Class Period, Plaintiff and members of the Classes directly purchased analog insulin drugs from Defendants.  As a result of the Defendants' anticompetitive conduct, Plaintiff and members of the Classes paid more for analog insulin drugs than they would have and thus suffered substantial damages.  This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

238.    Because Defendants' unlawful conduct has successfully eliminated competition in the market, and Plaintiff and members of the Classes have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such damages will be calculated after discovery and upon proof at trial.

239.    Defendants' misconduct reduced competition in the analog insulin drugs market, reduced choice for purchasers, and caused injury to purchasers.

240.    Defendants' anticompetitive conduct is ongoing, and, as a result, Plaintiff and members of the Classes continue to pay supra-competitive prices for analog insulin drugs.

## VIII.    FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

241.    During the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiff and members of the Classes.

242.    Because of Defendants' active concealment of their unlawful conduct and collusion, Plaintiff and members of the Classes had no knowledge of the combination or conspiracy alleged herein or of facts sufficient to place them on inquiry notice of the claims set forth herein, until at least November of 2016.

243.    To facilitate their illegal scheme to fix prices, Defendants closely guarded their collusion to increase prices and their pricing structures and sales figures for their analog insulins. In particular, each Defendant concealed the fact that Defendants agreed to increase prices in order to fund their payments to PBMs for favorable formulary placement.

244.    Defendants went to great lengths to conceal their program of kickbacks and collusion to increase prices to pass along the costs of rebates to PBM, even concealing it from investors.  For instance, Novo concealed its relationship with PBMs, preventing them from obtaining accurate information regarding Novo's insulin sales.  In Novo's 2015 Annual Report, the company stated its "[p]roduct success is largely based on competition on efficacy, safety, quality and price." Novo (and all of the other Defendants) knew that the selection of insulin drugs for formulary placement was driven by the kickbacks, not efficacy, safety, quality or price.

245.    Information regarding the government investigation of Defendants' alleged unlawful conduct in the analog insulin market was not made public until November 2016.

246.    Given the government's role as the single largest healthcare payor in the U.S., the government's inability to uncover any evidence of Defendants' unlawful scheme to artificially

raise and fix prices until late 2016 demonstrates that Plaintiff and members of the Classes could not have discovered Defendants' fraud prior to that time.

247.    Further, Defendants made misleading public statements regarding price increases and their actual profits from the sale of insulin drugs.  For example, in 2017, Lilly spokesperson Julie Williams stated:

> The amount the manufacturer receives after all discounts and rebates are applied is considerably less than the list price.  For example, the net price for Humalog – our most commonly used insulin – increased by 4 percent over the five-year period of 2009 to 2014, which is a much smaller increase than what some consumers have experienced.[54]

248.    Similarly, on November 30, 2016, Novo issued a press release regarding AWP prices and actual profits that, among other things, stated:

> News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade.  In other words, a list price increase by XX percent leads to an automatic XX percent profit for the drug maker.  We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases.  However, after we set the list price, we negotiate with the companies that actually pay for the medicines, which we call payers.  This is necessary in order for our medicines to stay on their preferred drug list or formulary.  The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price."  The net price more closely reflects our actual profits.

249.    Defendants previously made public statements to conceal their unlawful scheme to artificially raise and fix prices.

250.    These statements were false and misleading because, *inter alia*, they failed to disclose to Plaintiff and members of the Classes that the increased prices that distributors were

---

[54]    *See The High Cost of Insulin (Plus a Plea to Lilly, Novo, and Sanofi)*, HEALTHLINE.COM, http://www.healthline.com/diabetesmine/high-cost-insulin-and-plea-to-lilly#4.

forced to pay for the Defendants' analog insulin products were not a function of the need to preserve Defendants' actual profits or other appropriate market forces.

251.    Further, neither Defendants nor their co-conspirators told Plaintiff or other members of the Classes that they were colluding and fixing prices.

252.    Finally, PBMs are so secretive about their collection and distribution of drug company payments that, during an client audit, Defendant PBMs, (i) require preapproval of the client's chosen auditor; (ii) restrict the number of drug company contracts that can be reviewed to a very limited number; (iii) restrict the number of claims and time period that can be reviewed; (iv) refuse to allow any drug company contract to be copied; (v) require a PBM representative to sit with every auditor that is reviewing a drug company contract; and (vi) refuse to allow any auditor to copy by hand the terms of any drug company contract, among other  restrictions.

253.    Plaintiff and the Classes could not have discovered the violations alleged herein earlier than late 2016, because Defendants acted in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. The conspiracy was by its nature self-concealing.

254.    As a result of Defendants' fraudulent concealment of their conspiracy and illegal conduct, any applicable statute of limitations affecting the rights of action of Plaintiff and members of the Classes has been tolled.

## IX.  CLASS ACTION ALLEGATIONS

255.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiff brings this action on behalf of three direct purchaser classes: (1) direct purchasers of NovoLog and Humalog from Defendants Eli Lilly and Novo Nordisk during the period January 1, 2009 through the present; (2) direct purchasers of Lantus and Levemir from Defendants Sanofi and Novo Nordisk during the period January 1, 2009 through the present; and (3) Robinson-Patman Act direct purchasers of NovoLog, Humalog, Lantus, and Levemir from Defendants Sanofi, Novo Nordisk, and Eli Lilly during the period January 1, 2009 through the present.

### A.    **NovoLog and Humalog Direct Purchaser Class**

220.    The NovoLog and Humalog Direct Purchaser Class is defined as follows:

All persons or entities that directly purchased NovoLog and/or Humalog from Defendants Eli Lilly and Novo Nordisk in the United States and its territories and possessions at any time during the period January 1, 2009 through the present (the "Class Period").

Excluded from the NovoLog and Humalog Direct Purchaser Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

256.    Plaintiff believes that there are dozens of members of the Class that are geographically dispersed throughout the United States.  As a result, joinder of all members of the respective Class is impracticable.

257.    The members of the Class are readily identifiable from information and records maintained by Defendants.

258.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff's interests are not antagonistic to the claims of the other members of the Class, and Plaintiff possesses no material conflicts with any other members of the Class that would make class certification inappropriate.

259.     Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.  Plaintiff and all members of the Class directly purchased NovoLog and Humalog from Defendants, and therefore possess the requisite standing.

260.     Plaintiff will fairly and adequately protect and represent the interests of all members of the Class.  Plaintiff's interests are consistent with, and not antagonistic to, those of the members of the Class.

261.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular expertise pursuing class action litigation involving alleged antitrust and RICO law violations.

262.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the entire Class.  As a result, determining damages with respect to the Class as a whole is appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

263.     The predominant common legal and factual questions applicable to all members of the Class include, but are not limited to, the following:

> a. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby artificially increase and/or maintain the prices of NovoLog and Humalog in the United States;
>
> b. The duration and extent of the alleged contract, combination or conspiracy;
>
> c. Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;
>
> d. The effect of the contract, combination, or conspiracy on the prices of Novolog and Humalog in the United States during the Class Period;

e.  Whether Defendants' conduct caused supra-competitive prices for NovoLog and Humalog;

f.  Whether, and to what extent, the conduct of Defendants and their co-conspirators caused antitrust injury to Plaintiff and members of the Class;

g.  Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

h.  Whether the alleged acts herein violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

i.  Whether Defendants and their co-conspirators formed association-in-fact enterprises for the common purpose of securing favorable formulary positions through which they artificially increased the Distributor Prices and benchmark prices of NovoLog, Humalog, Lantus, and Levemir in the United States;

j.  Whether Defendants and their co-conspirators were participants in the enterprises alleged herein;

k.  The effect of the enterprises on the Distributor Prices of NovoLog, Humalog, Lantus, and Levemir in the United States during the Class Period;

l.  Whether Defendants' conduct caused artificially inflated prices for NovoLog, Humalog, Lantus, and Levemir;

m.  Whether Defendants committed mail and wire fraud;

n.  Whether Defendants' acts of mail and wire fraud constituted a pattern of racketeering activity;

Whether Defendants' pattern of racketeering activity satisfied the long-term or short-term continuity requirement of the federal and New Jersey RICO statutes; And

o.  Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiff and other Class members.

264.    Those common questions do not vary among the members of the Class.  As a result, the Court and the jury may resolve those issues without reference to the individual circumstances of any member of the Class.

265.    Class action treatment is a superior method for the fair and efficient adjudication of the claims asserted by all members of the Class.  Such treatment will permit many similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

266.    The benefits of proceeding through the class mechanism, including providing all members of the Class a method for obtaining redress on claims that they could not practicably pursue individually, substantially outweigh potential difficulties in the management of this litigation as a class action.

267.    Plaintiff knows of no special difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

### B.    Lantus and Levemir Direct Purchaser Class

220.    The Lantus and Levemir Direct Purchaser Class is defined as follows:

All persons or entities that directly purchased Lantus and/or Levemir from Defendants Sanofi and Novo Nordisk in the United States and its territories and possessions at any time during the period January 1, 2009 through the present (the "Class Period").

Excluded from the Lantus and Levemir Direct Purchaser Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

268.    Plaintiff believes that there are dozens of members of the Class that are geographically dispersed throughout the United States.  As a result, joinder of all members of the respective Class is impracticable.

269.    The members of the Class are readily identifiable from information and records maintained by Defendants.

270.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff's interests are not antagonistic to the claims of the other members of the Class, and Plaintiff possesses no material conflicts with any other members of the Class that would make class certification inappropriate.

271.     Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.  Plaintiff and all members of the Class directly purchased NovoLog and Humalog from Defendants, and therefore possess the requisite standing.

272.     Plaintiff will fairly and adequately protect and represent the interests of all members of the Class.  Plaintiff's interests are consistent with, and not antagonistic to, those of the members of the Classes.

273.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular expertise pursuing class action litigation involving alleged antitrust violations.

274.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the entire Class.  As a result, determining damages with respect to the Class as a whole is appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

275.     The predominant common legal and factual questions applicable to all members of the Class include, but are not limited to, the following:

     a.   Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby artificially increase the prices of Lantus and Levemir in the United States;

     b.   The duration and extent of the alleged contract, combination or conspiracy;

c.   Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

d.   The effect of the contract, combination, or conspiracy on the prices of Lantus and Levemir in the United States during the Class Period;

e.   Whether Defendants' conduct caused supra-competitive prices for Lantus and Levemir;

f.   Whether, and to what extent, the conduct of Defendants and their co-conspirators caused antitrust injury to Plaintiff and members of the Class;

g.   Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

h.   Whether the alleged acts herein violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

i.   Whether Defendants and their co-conspirators formed association-in-fact enterprises for the common purpose of securing favorable formulary positions through which they artificially increased the Distributor Prices and benchmark prices of NovoLog, Humalog, Lantus, and Levemir in the United States;

j.   Whether Defendants and their co-conspirators were participants in the enterprises alleged herein;

k.   The effect of the enterprises on the Distributor Prices of NovoLog, Humalog, Lantus, and Levemir in the United States during the Class Period;

l.   Whether Defendants' conduct caused artificially inflated prices for NovoLog, Humalog, Lantus, and Levemir;

m.   Whether Defendants committed mail and wire fraud;

n.   Whether Defendants' acts of mail and wire fraud constituted a pattern of racketeering activity;

o.   Whether Defendants' pattern of racketeering activity satisfied the long-term or short-term continuity requirement of the federal and New Jersey RICO statutes;
and

p.   Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiff and other Class members.

276.    Those common questions do not vary among the members of the Class.  As a result, the Court and the jury may resolve those issues without reference to the individual circumstances of any member of the Class.

277.    Class action treatment is a superior method for the fair and efficient adjudication of the claims asserted by all members of the Class.  Such treatment will permit many similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

278.    The benefits of proceeding through the class mechanism, including providing all members of the Class a method for obtaining redress on claims that they could not practicably pursue individually, substantially outweigh potential difficulties in the management of this litigation as a class action.

279.    Plaintiff knows of no special difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## C.    **Robinson-Patman Act Direct Purchaser Class**

220.    The Robinson-Patman Act Direct Purchaser Class is defined as follows:

All persons or entities that directly purchased NovoLog, Humalog, Lantus, and Levemir from Defendants Sanofi, Novo Nordisk, and Eli Lilly in the United States and its territories and possessions at any time during the period January 1, 2009 through the present (the "Class Period").

Excluded from the Robinson-Patman Act Direct Purchaser Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

280.    Plaintiff believes that there are dozens of members of the Class that are geographically dispersed throughout the United States.  As a result, joinder of all members of the respective Class is impracticable.

281.    The members of the Class are readily identifiable from information and records maintained by Defendants.

282.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff's interests are not antagonistic to the claims of the other members of the Class, and Plaintiff possesses no material conflicts with any other members of the Class that would make class certification inappropriate.

283.    Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants.  Plaintiff and all members of the Class directly purchased Humalog, NovaLog, Lantus, and Levemir from Defendants, and therefore possess the requisite standing.

284.    Plaintiff will fairly and adequately protect and represent the interests of all members of the Class.  Plaintiff's interests are consistent with, and not antagonistic to, those of the members of the Classes.

285.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular expertise pursuing class action litigation involving alleged antitrust violations.

286.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the entire Class.  As a result, determining damages with respect to the Class as a whole is appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

287.    The predominant common legal and factual questions applicable to all members of the Class include, but are not limited to, the following:

        q.  Whether Defendants and their co-conspirators engaged in an unlawful kickback scheme and thereby committed commercial bribery;

r.   The duration and extent of the alleged contract, combination or conspiracy;

s.   Whether Defendants and their co-conspirators were participants in the commercial bribery alleged herein;

t.   The effect of the commercial bribery on the prices of Humalog, NovaLog, Lantus, and Levemir in the United States during the Class Period;

u.   Whether Defendants' conduct caused supra-competitive prices for Humalog, NovaLog, Lantus, and Levemir;

v.   Whether, and to what extent, the conduct of Defendants and their co-conspirators caused Robinson-Patman Act injury to Plaintiff and members of the Class;

w.   Whether the alleged unlawful kickback scheme violated Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c);

288.   Those common questions do not vary among the members of the Class. As a result, the Court and the jury may resolve those issues without reference to the individual circumstances of any member of the Class.

289.   Class action treatment is a superior method for the fair and efficient adjudication of the claims asserted by all members of the Class. Such treatment will permit many similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

290.   The benefits of proceeding through the class mechanism, including providing all members of the Class a method for obtaining redress on claims that they could not practicably pursue individually, substantially outweigh potential difficulties in the management of this litigation as a class action.

291.   Plaintiff knows of no special difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,
### Against Defendants Eli Lilly and Novo Nordisk

292.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

293.    Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

294.    Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

295.    Defendants' anticompetitive acts were intentional, were directed at the sales of Humalog and NovoLog in the United States and had a substantial and foreseeable effect on interstate commerce by raising and fixing Humalog and NovoLog prices throughout the United States.

296.    In formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of Humalog and NovoLog including agreeing to coordinate and manipulate the prices of Humalog and NovoLog in a manner that deprived purchasers in the U.S. of price competition and providing pretextual justifications to purchasers and the public to explain any raises, maintenance or stabilization of the prices for Humalog and NovoLog.

297.     The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

     a.     Prices charged to, and paid by, Plaintiff for Humalog and NovoLog were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

     b.     Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the sale of Humalog and NovoLog in the United States market; and

     c.     Competition in establishing the prices paid for Humalog and NovoLog was unlawfully restrained, suppressed, or eliminated.

298.     There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

299.     As set forth above, in violation of Section 1 of the Sherman Antitrust Act, Defendants entered into agreements with one another on the pricing of Humalog and NovoLog in the U.S.  This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

300.     Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

301.     The conspiracy had its intended effect, as Defendants benefited from their collusion and the elimination of competition, both of which artificially inflated the prices of Humalog and NovoLog as described herein.

302.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Classes have been injured in their business and property in that they have paid more for Humalog and NovoLog than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

303.   Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

### SECOND CAUSE OF ACTION
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,
### Against Defendants Sanofi and Novo Nordisk

304.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

305.   Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

306.   Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

307.   Defendants' anticompetitive acts were intentional, were directed at the sales of Lantus and Levemir in the United States and had a substantial and foreseeable effect on interstate commerce by raising and fixing Lantus and Levemir prices throughout the United States.

308.   In formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of Lantus and Levemir including agreeing to coordinate and manipulate the prices of Lantus and Levemir in a manner that deprived purchasers in the U.S. of price competition and providing pretextual justifications to purchasers and the public to explain any raises, maintenance or stabilization of the prices for Lantus and Levemir.

309.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

    a.   Prices charged to, and paid by, Plaintiff for Lantus and Levemir were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

    b.   Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the sale of Lantus and Levemir in the United States market; and

    c.   Competition in establishing the prices paid for Lantus and Levemir was unlawfully restrained, suppressed, or eliminated.

310.   There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

311.   As set forth above, in violation of Section 1 of the Sherman Antitrust Act, Defendants entered into agreements with one another on the pricing of Lantus and Levemir in the U.S.  This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

312.   Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

313.   The conspiracy had its intended effect, as Defendants benefited from their collusion and the elimination of competition, both of which artificially inflated the prices of Lantus and Levemir as described herein.

314.   As a result of Defendants' unlawful conduct, Plaintiff and members of the Classes have been injured in their business and property in that they have paid more for Lantus and Levemir than they otherwise would have paid in the absence of Defendants' unlawful conduct.

The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

315.   Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

**THIRD CAUSE OF ACTION**
**Overarching Conspiracy in Violation of Section 1 of the Sherman Act,**
**15 U.S.C. § 1, Against All Defendants**

316.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

317.   Defendants engaged in an overarching conspiracy to artificially fix, raise, maintain and/or stabilize the prices of analog insulin drugs.

318.   Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

319.   Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

320.   Defendants' anticompetitive acts were intentional, were directed at the sales of analog insulin drugs in the United States and had a substantial and foreseeable effect on interstate commerce by raising and fixing analog insulin drug prices throughout the United States.

321.   In formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of analog insulin drugs including

agreeing to coordinate and manipulate the prices of analog insulin drugs in a manner that deprived purchasers in the U.S. of price competition and providing pretextual justifications to purchasers and the public to explain any raises, maintenance or stabilization of the prices for analog insulin drug.

322.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

     a.  Prices charged to, and paid by, Plaintiff for analog insulin drugs were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

     b.  Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the sale of analog insulin drugs in the United States market; and

     c.  Competition in establishing the prices paid for analog insulin drugs was unlawfully restrained, suppressed, or eliminated.

323.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

324.    As set forth above, in violation of Section 1 of the Sherman Antitrust Act, Defendants entered into agreements with one another on the pricing of analog insulin drugs in the U.S.  This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

325.    Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

326.    The conspiracy had its intended effect, as Defendants benefited from their collusion and the elimination of competition, both of which artificially inflated the prices of analog insulin drugs as described herein.

327.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Classes have been injured in their business and property in that they have paid more for analog insulin drugs than they otherwise would have paid in the absence of Defendants' unlawful conduct.  The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

328.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

**FOURTH CAUSE OF ACTION**
**Violation of Section 2 of the Sherman Act,**
**15 U.S.C. § 2, Against Defendants Eli Lilly and Novo Nordisk**

329.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

330.    Defendants possessed (and currently possess) monopoly power in the Lantus and Levemir market.

331.    Defendants and their co-conspirators knowingly and willfully acquired, maintained, enhanced and unlawfully exercised monopoly power in the Humalog and NovoLog market through their anti-competitive agreement with the specific intent to monopolize the Humalog and NovoLog market, and preventing competition in the market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

332.    Defendants' anticompetitive acts were intentional, were directed at the sales of Humalog and NovoLog in the United States and had a substantial and foreseeable effect on interstate commerce by raising and fixing Humalog and NovoLog prices throughout the United States.

333.    As a result of Defendants' unlawful anticompetitive agreements and practices alleged herein, Defendants and co-conspirators have effectively excluded competition from the Humalog and NovoLog market, unlawfully maintained Defendants' monopoly in the Humalog and NovoLog, and profited (and currently profit) from their anti-competitive conduct by maintaining Humalog and NovoLog prices at artificially high levels.

334.    Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

335.    There is no legitimate business justification for the anti-competitive actions of the Defendants and the conduct through which Defendants maintained its monopoly in the market. The anti-competitive effects of Defendants agreement far outweigh any conceivable pro-competitive benefit or justification.

336.    As a direct and proximate result of Defendants' unlawful anticompetitive actions, Plaintiff and members of the Classes have been and continue to be injured in their business or property.

337.    As a direct and proximate result of Defendants' unlawful and uncompetitive actions, Plaintiff and members of the Classes have been forced to pay artificially high, supracompetitive prices for Defendants and were harmed thereby.

338.    Plaintiff and members of the Classes are entitled to treble damages to remedy the injuries they have suffered from Defendants' violations of Sherman Act § 2, 15 U.S.C. § 2.

**FIFTH CAUSE OF ACTION**
**Violation of Section 2 of the Sherman Act,**
**15 U.S.C. § 2, Against Defendants Sanofi and Novo Nordisk**

339.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

340.     Defendants possessed (and currently possess) monopoly power in the Lantus and Levemir market.

341.     Defendants and their co-conspirators knowingly and willfully acquired, maintained, enhanced and unlawfully exercised monopoly power in the analog insulin market through their anti-competitive agreement with the specific intent to monopolize the Lantus and Levemir market, and preventing competition in the market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

342.     Defendants' anticompetitive acts were intentional, were directed at the sales of Lantus and Levemir in the United States and had a substantial and foreseeable effect on interstate commerce by raising and fixing Lantus and Levemir prices throughout the United States.

343.     As a result of the conspiracy, Defendants have effectively excluded competition from the Lantus and Levemir market, unlawfully maintained Defendants' monopoly in the Lantus and Levemir market, and profited (and currently profit) from their anti-competitive conduct by maintaining prices at artificially high levels.

344.     Each Defendant has committed at least one overt act to further the conspiracy alleged in this Complaint.

345.     There is no legitimate business justification for the anti-competitive actions of the Defendants and the conduct through which Defendants maintained its monopoly in the market. The anti-competitive effects of Defendants agreement far outweigh any conceivable pro-competitive benefit or justification.

346.     As a direct and proximate result of Defendants' unlawful and anticompetitive actions, Plaintiff and members of the Classes have been and continue to be injured in their business or property.

347.    As a direct and proximate result of Defendants' unlawful and uncompetitive actions, Plaintiff and members of the Classes have been forced to pay artificially high, supracompetitive prices for Defendants and were harmed thereby.

348.    Plaintiff and members of the Classes are entitled to treble damages to remedy the injuries they have suffered from Defendants' violations of Sherman Act § 2, 15 U.S.C. § 2.

**SIXTH CAUSE OF ACTION**
**Overarching Conspiracy in Violation of Section 2 of the Sherman Act,**
**15 U.S.C. § 2, Against All Defendants**

349.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

350.    Defendants and their co-conspirators have conspired to allow Defendants to willfully maintain and unlawfully exercise monopoly power in the analog insulin market through their anti-competitive agreement with the specific intent to monopolize the analog insulin market, and preventing competition in the market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

351.    Defendants' conspiracy intentional, were directed at the sales of analog insulin in the United States and had a substantial and foreseeable effect on interstate commerce by raising and fixing analog insulin prices throughout the United States.

352.    As a result of Defendants' unlawful anticompetitive practices alleged herein, Defendants and co-conspirators have effectively excluded competition from the analog insulin market, unlawfully maintained Defendants' monopoly in the analog insulin market, and profited (and currently profit from) from their anti-competitive conduct by maintaining analog insulin prices at artificially high levels.

353.    Defendants committed at least one overt act in furtherance of the conspiracy, in that Defendants formed an agreement as set forth herein.

354.    As a result of the Defendants' conspiratorial conduct, Defendants have effectively excluded competition from the analog insulin market, allowing Defendants to unlawfully maintain its monopoly in the analog insulin market, including the agreement between Defendants. The anti-competitive effects of Defendants' agreement far outweigh any conceivable pro-competitive benefit or justification.

355.    There is no legitimate business justification for the anti-competitive actions of the Defendants and the conduct through which Defendants maintained its monopoly in the market. The anti-competitive effects of Defendants agreement far outweigh any conceivable pro-competitive benefit or justification.

356.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff and members of the Classes have been and continue to be injured in their business or property.

357.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff and members of the Classes have been forced to pay artificially high, supracompetitive prices for Defendants and were harmed thereby.

358.    Plaintiff and members of the Classes are entitled to damages and other relief by law for the injuries they have suffered from Defendants' violations of Sherman Act § 2, 15 U.S.C. § 2.

## SEVENTH CAUSE OF ACTION
### Violation of the Robinson-Patman Act,
### 15 U.S.C. § 13(c), Against Defendants Eli Lilly and Novo Nordisk

359.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

360.    By engaging in the illegal and collusive pricing practices described herein, including, but not limited to, Defendants' kickback scheme, Defendants have engaged in commercial bribery in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

361.    Defendants and their co-conspirators' kickback scheme described above provides illegal inducements that resulted in artificially inflated Humalog and NovoLog pricing.

362.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Classes have purchased Humalog and NovoLog at artificially inflated prices.

363.    The effect of Defendants' price discrimination is a reasonable possibility of a substantial lessoning of competition or tendency to create a monopoly in the analog insulin market.

364.    There is no appropriate or legitimate business justification for Defendants' anticompetitive conduct.

365.    Humalog and NovoLog are commodities of like grade and quality.

366.    Defendants' unlawful conduct has resulted in competitive injury to Plaintiff and the members of the Classes by unduly restraining, hindering, suppressing and/or eliminating competition in the sale of commodities in interstate commerce.

367.    As a direct and proximate result of Defendants' unlawful actions detailed herein, Plaintiff has suffered substantial economic losses and other damage to its business, reputation, and relationship with customers, including, but not limited to, overcharges, lost sales, and lost profits.

368.    Plaintiff and members of the Classes are entitled to recover treble damages treble damages and costs of suit, including reasonable attorneys' fees pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**EIGHTH CAUSE OF ACTION**
**Violation of the Robinson-Patman Act,**
**15 U.S.C. § 13(c), Against Defendants Sanofi, Eli Lilly, and Novo Nordisk**

369.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

370.    By engaging in the illegal and collusive pricing practices described herein, including, but not limited to, Defendants' kickback scheme, Defendants have engaged in commercial bribery in violation of Section 29(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

371.    Defendants and their co-conspirators' kickback scheme described above provides illegal inducements that resulted in artificially inflated Lantus and Levemir pricing.

372.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Classes have purchased Lantus and Levemir at artificially inflated prices.

373.    The effect of Defendants' price discrimination is a reasonable possibility of a substantial lessoning of competition or tendency to create a monopoly in the analog insulin market.

374.    There is no appropriate or legitimate business justification for Defendants' anticompetitive conduct.

375.    Lantus and Levemir are commodities of like grade and quality.

376.    Defendants' unlawful conduct has resulted in competitive injury to Plaintiff and the members of the Classes by unduly restraining, hindering, suppressing and/or eliminating competition in the sale of commodities in interstate commerce.

377.    As a direct and proximate result of Defendants' unlawful actions detailed herein, Plaintiff has suffered substantial economic losses and other damage to its business, reputation, and relationship with customers, including, but not limited to, overcharges, lost sales, and lost profits.

378.    Plaintiff and members of the Classes are entitled to recover treble damages treble damages and costs of suit, including reasonable attorneys' fees pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

**NINTH CAUSE OF ACTION**
**(Violation of 18 U.S.C. § 1962(c) Against Novo and CVS)**

379.    Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

380.    Plaintiff brings this claim on behalf of the Class against Novo and CVS pursuant

to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief

based upon Novo's and CVS' violations of 18 U.S.C. § 1962(c).

381.    Novo and CVS are each a "person," within the meaning of 18 U.S.C. § 1961(3),

that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation

of 18 U.S.C. § 1962(c).

382.    All members of the Classes are "persons," as that term is defined in 18 U.S.C. §

1961(3), that were injured in their business or property as a result of Novo's and CVS' wrongful

conduct.

**A.  The Novo-CVS Enterprise**

383.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact

that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships

among those associated with the enterprise; and (iii) longevity sufficient to pursue the

enterprise's purpose.

384.    Novo and CVS formed such an association-in-fact enterprise (the "Novo-CVS

Enterprise") that consists of: (a) Novo, including its employees and agents; and (b) the PBM

CVS Caremark, including its employees and agents.

385.    The Novo-CVS Enterprise is an ongoing and continuing business organization

consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained

systematic links for a common purpose.  That common purpose was to enrich Novo and CVS by

85

providing the largest possible spread between the AWP and actual net selling price for Novo's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, Novolog, in exchange for securing exclusive, or at least favorable, formulary positions for those medications as treatments for Type 1 and 2 diabetes.

386. To accomplish this purpose, the Novo-CVS Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Levemir and Novolog and represented—either affirmatively or through half-truths and omissions—to Plaintiff and members of the Classes that the Direct Purchaser Prices and AWP prices of Levemir and Novolog fairly and accurately reflected the actual cost of those medications in a competitive marketplace free of kickbacks and other illicit conduct.

387. The Novo-CVS Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Novo supplied to CVS in connection with the purchases of Levemir and Novolog that they effectively controlled.

388. The Novo-CVS Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates. The difference between the AWP prices and the real prices of Levemir and Novolog negotiated by CVS produced increased profits for Novo and CVS.

389. Thus, Novo's large rebates served to ensure that CVS would place and maintain Levemir and Novolog in preferred or favorable positions on CVS' formularies.

390. By maintaining those favorable formulary positions for Levemir and Novolog, the Novo-CVS Enterprise ensured that a larger number of prescriptions for those medications would be written and filled.

391.     The Novo-CVS Enterprise thus advanced the joint interests of Novo and CVS by producing higher sales (and therefore profits) for Novo and larger spreads, thus, allowing for larger kickbacks for CVS.

392.     The Price Inflation Schemes the Novo-CVS Enterprise perpetrated was dependent upon Novo charging Plaintiff and members of the Classes—all of whom are direct purchasers of analog insulin drugs from Novo—artificially inflated prices for Levemir and Novolog to fund the kickbacks that Novo paid to CVS.

393.     The persons engaged in the Novo-CVS Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Novo and CVS spearhead.

394.     To facilitate the Levemir/Novolog Pricing Enterprise, Novo and CVS engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog and the rebates payable to CVS, and otherwise plot to advance their shared interests.

395.     Novo and CVS functioned as a continuing unit for the purposes of advancing the shared interests of the Novo-CVS Pricing Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

396.     CVS struck rebate deals with Novo to conceal the true prices of Levemir and Novolog and to profit from the inflated rebates Novo agreed to pay to CVS.

397.     As a result of those rebates, Novo and CVS perpetuated the Novo-CVS Enterprise's scheme and reaped substantial profits.

398.     Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Novo's analog insulins, CVS did

not challenge Novo's reported AWP prices, terminate its role in the Novo-CVS Enterprise, or disclose publicly that the Levemir and Novolog Direct Purchaser Prices that Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

399.    Novo could not have accomplished the purpose of the Novo-CVS Enterprise without the assistance of CVS.

400.    For Novo to profit from the scheme, CVS needed to convince health care payers and plan sponsors to approve formularies on which Levemir and Novolog were given favorable treatment.

401.    CVS accomplished that objective by making a series of material misrepresentations and omissions.  In particular, CVS told clients, potential clients, and investors that they secured significant discounts for the Levemir and Novolog utilized by consumers.

402.    However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Novo-CVS Enterprise's Price Inflation Schemes.  The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real prices of Levemir and Novolog.

403.    The Novo-CVS Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

404.    The impacts of the Novo-CVS Enterprise's Price Inflation Schemes persist to this day—*i.e.*, the artificially inflated prices of Levemir and Novolog to fund the rebates/kickbacks.

**B.  Novo and CVS Conducted and Participated in the Conduct of the Novo-CVS Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity**

405. During the Class Period, Novo and CVS conducted and participated in the conduct of the affairs of the Novo-CVS Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

406. Novo and CVS exerted control over the Novo-CVS Enterprise and participated in the operation and management of the affairs of the Novo-CVS Enterprise, directly or indirectly, in the following ways:

    a. Novo established and published the Levemir and Novolog AWP prices;

    b. Novo regularly raised Levemir and Novolog Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

    c. Novo paid CVS substantial rebates/kickbacks in exchange for the CVS's commitment to give Levemir and Novolog exclusive, or at least favorable, formulary placement;

    d. Novo concealed from Plaintiff and members of the Classes the existence of rebates/kickbacks that were included in Direct Purchaser Prices;

    e. Novo intended that CVS would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Levemir and Novolog) saved health care purchasers money on their prescription needs and knew that CVS did distribute those material misrepresentations;

    f. Novo made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Levemir and Novolog without stating that those price increases included kickbacks paid to CVS;

    g. CVS negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Levemir and Novolog;

    h. CVS developed formularies that provided Novo favorable placements for Levemir and Novolog based on the rebates/kickbacks that CVS would earn from the sale of those products;

      i.   CVS excluded competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

      j.   CVS marketed formularies to health plan clients and made material misrepresentations that the rebates/kickbacks negotiated from Novo saved those clients and their members money;

      k.   CVS made material misrepresentations that the AWP prices that Novo published reflected the actual prices of these insulin products and did not include kickbacks received by the PBM Defendants; and

      l.   CVS concealed the actual rebates earned from Novo from health plan clients and the general public, and therefore concealed the actual, net amount Novo received for these insulin products.

407.    CVS's conduct and participation are essential to the success of the enterprise. For Novo to maintain its net prices for its products, it required CVS to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices.  It also required CVS to market its health plan clients that the rebates Novo offered saved the clients and their members money to conceal the actual rebates paid by Novo. CVS' participation allowed Novo to inflate its AWP prices, offer larger rebates to CVS to maintain access to that portion of the market, and still earn additional profits.

408.    Novo and CVS' pattern of racketeering activity involved thousands of separate instances where Novo and CVS used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Schemes.

409.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Levemir® FlexPen® 5X3ML was various prices starting at $158.15 in January 2009 and increasing to $333.12 by September 2014.

410.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of

Levemir® FlexTouch® was various prices starting at $287.96 in June 2014 and increasing to $403.50 by May 2016.

411.    Based on information currently available, during the class period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Levemir® 100 unit/ML 10 ML vile was various prices starting at $81.11 in January 2009 and increasing to $269.00 by May 2016.

412.    In all circumstances, Novo concealed the Price Inflation Schemes and concealed that Novo would pay a substantial portion of the quoted Direct Purchaser Prices to CVS to fund that scheme.

413.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® FlexPen® 5X3ML was various prices starting at $167.45 in January 2009 and increasing to $457.10 by May 2016.

414.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® Penfill® 3ML was various prices starting at $161.03 in January 2009 and increasing to $415.10 by October 2015.

415.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® 100 unit/ML 10 ML vile was various prices starting at $86.69 in January 2009 and increasing to $236.70 by May 2016.

416.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of

Novolog® Mix 70/30 FlexPen® 5X3ML was various prices starting at $167.45 in January 2009 and increasing to $457.10 by May 2016.

417.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® Mix 70/30 100 unit/ML 10 ML vile was various prices starting at $86.69 in January 2009 and increasing to $245.50 by April 2016.

418.    In all circumstances, Novo concealed the Price Inflation Schemes and concealed that Novo would pay a substantial portion of the quoted Direct Purchaser Prices to CVS to fund that scheme.

419.    Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

420.    By means of that pattern of racketeering activity, Novo and CVS defrauded Plaintiff and members of the Classes.

421.    Novo's and CVS's acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

422.    Novo and CVS intentionally crafted the Levemir and Novolog Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Levemir and Novolog.

423.     When Novo and CVS designed and implemented its illicit scheme, Novo and CVS were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

424.     The pattern of racketeering activity alleged herein and the Novo-CVS Pricing Enterprise are separate and distinct from each other.  Likewise, Novo and CVS are distinct from the Novo-CVS Pricing Enterprise.

425.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Novo's and CVS' Use of the U.S. Mail and Interstate Wire Facilities**

426.     The Novo-CVS Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog; the receipt of payments by Novo from Plaintiff and members of the Classes for analog insulin drug purchases; Novo's payment of substantial rebates to CVS in exchange for the favorable placement of Levemir and Novolog on CVS' formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Novo paid to CVS.

427.     During the Class Period, the Novo-CVS Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

428.     The nature and pervasiveness of the Levemir and Novolog Price Inflation Schemes, which was orchestrated out of the corporate headquarters of Novo and CVS, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

429.     For example, to perpetrate the Levemir and Novolog Price Inflation Schemes, Novo used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog.  Novo distributed those fraudulent representations in:

    a.  Marketing materials concerning Novo's Levemir and Novolog AWP prices that Novo transmitted to health care payers and health care providers located across the country;

    b.  The annual written disclosures that Novo made to the publishers of AWP price compendia regarding the Levemir and Novolog AWP prices and their subsequent mark-ups;

    c.  Written materials provided to CVS and telephonic discussions with CVS regarding Levemir and Novolog markups and AWP prices and the rebates paid by Novo to CVS related to those medications;

    d.  Numerous e-mails and text messages between Novo and CVS regarding the operation of the Enterprise's Price Inflation Schemes; and

    e.  Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Levemir and Novolog; (ii) the existence, amount, and purpose of the Levemir and Novolog rebates; and (iii) the true costs of Levemir and Novolog after the payment of Novo's rebates to CVS.

430.     Novo also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive payments from Plaintiff and members of the Classes for purchases of Levemir and Novolog.  Those

payments constituted the wrongful proceeds of the racketeering activity in which Novo and CVS engaged.

431.    The materially false and misleading representations that Novo made in furtherance of the Price Inflation Schemes that the Levemir/Novolog Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Levemir and Novolog pricing, and forestall changes to healthcare payers' historical practice of utilizing Levemir and Novolog AWP prices as a basis for prescription reimbursement.

**D.  The Damages Caused by Novo's and CVS' Levemir and Novolog Price Inflation Schemes**

432.    Novo's and CVS' pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Levemir and/or Novolog.

433.    But for the fraudulent representations and material omissions made by Novo and CVS, and the fraudulent pricing scheme the Levemir/Novolog Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for the Levemir and Novolog they purchased.

434.    Even though the Levemir/Novolog Pricing Enterprise was operated to provide Novo with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Novo's competitors.

435.    Plaintiff and those similarly situated were directly harmed by Novo's fraud and pattern of racketeering activity.  There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms that Novo's and CVS' fraudulent scheme caused to direct purchasers of Levemir and Novolog from Novo.

436.    By virtue of these violations of 18 U.S.C. § 1962(c), Novo and CVS are liable to Plaintiff and the members of the Classes for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

**TENTH CAUSE OF ACTION**
**(Violation of 18 U.S.C. § 1962 Against Novo and Optum)**

437.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

438.    Plaintiff brings this claim on behalf of the Class against Novo and Optum pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Novo's and Optum's violations of 18 U.S.C. § 1962(c).

439.    Novo and Optum are each a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

440.    All members of the Classes are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Novo's and Optum's wrongful conduct.

**A.  The Novo-Optum Enterprise**

441.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

442.    Novo and Optum formed such an association-in-fact enterprise (the "Novo-Optum Enterprise") that consists of: (a) Novo, including its employees and agents; and (b) the PBM Optum, including its employees and agents.

443. The Novo-Optum Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose. That common purpose was to enrich Novo and Optum by providing the largest possible spread between the AWP and actual net selling price for Novo's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, Novolog, in exchange for securing exclusive, or at least favorable, formulary positions for those medications as treatments for Type 1 and 2 diabetes.

444. To accomplish this purpose, the Novo-Optum Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Levemir and Novolog and represented—either affirmatively or through half-truths and omissions—to Plaintiff and members of the Classes that the Direct Purchaser Prices and AWP prices of Levemir and Novolog fairly and accurately reflected the actual cost of those medications in a competitive marketplace free of kickbacks and other illicit conduct.

445. The Novo-Optum Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Novo supplied to Optum in connection with the purchases of Levemir and Novolog that they effectively controlled.

446. The Novo-Optum Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates. The difference between the AWP price and the real prices of Levemir and Novolog negotiated by Optum produced increased profits for Novo and Optum.

447. Thus, Novo's large rebates served to ensure that Optum would place and maintain Levemir and Novolog in preferred or favorable positions on Optum's formularies.

448. By maintaining those favorable formulary positions for Levemir and Novolog, the Novo-Optum Enterprise ensured that a larger number of prescriptions for those medications would be written and filled.

449. The Novo-Optum Enterprise thus advanced the joint interests of Novo and Optum by producing higher sales (and therefore profits) for Novo and larger spreads, thus, allowing for larger kickbacks for Optum.

450. The Price Inflation Schemes the Novo-Optum Enterprise perpetrated was dependent upon Novo charging Plaintiff and members of the Classes—all of whom are direct purchasers of analog insulin drugs from Novo—artificially inflated prices for Levemir and Novolog to fund the kickbacks that Novo paid to Optum.

451. The persons engaged in the Novo-Optum Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Novo and Optum spearhead.

452. To facilitate the Levemir/Novolog Pricing Enterprise, Novo and Optum engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog and the rebates payable to Optum, and otherwise plot to advance their shared interests.

453. Novo and Optum functioned as a continuing unit for the purposes of advancing the shared interests of the Novo-Optum Pricing Enterprise. All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

454. Optum struck rebate deals with Novo to conceal the true prices of Levemir and Novolog and to profit from the inflated rebates Novo agreed to pay to Optum.

455. As a result of those rebates, Optum perpetuated the Novo-Optum Enterprise's scheme and reaped substantial profits.

456. Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Novo's analog insulins, Optum did not challenge Novo's reported AWP prices, terminate its role in the Novo-Optum Enterprise, or disclose publicly that the Levemir and Novolog Direct Purchaser Prices that Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

457. Novo could not have accomplished the purpose of the Novo-Optum Enterprise without the assistance of Optum.

458. For Novo to profit from the scheme, Optum needed to convince health care payers and plan sponsors to approve formularies on which Levemir and Novolog were given favorable treatment.

459. Optum accomplished that objective by making a series of material misrepresentations and omissions.  In particular, Optum told clients, potential clients, and investors that they secured significant discounts for the Levemir and Novolog utilized by consumers.

460. However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Novo-Optum Enterprise's Price Inflation Schemes.  The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real prices of Levemir and Novolog.

461. The Novo-Optum Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes

throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

462.    The impacts of the Novo-Optum Enterprise's Price Inflation Schemes persist to this day—*i.e.*, the artificially inflated prices of  Levemir and Novolog to fund the rebates/kickbacks.

463.    Thus, Novo and Optum continue to make large profits because of the massive spread between the Direct Purchaser Prices and AWP prices of Levemir and Novolog and the actual acquisition cost for Optum.

464.    In contrast, the Novo-Optum Pricing Enterprise's Price Inflation Schemes forces Plaintiff and other members of the Classes —the direct purchasers of analog insulin drugs—to pay artificially inflated Direct Purchaser Prices that enable Novo to pay kickbacks to Optum.

**B.  Novo and Optum Conducted and Participated in the Conduct of the Novo-Optum Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity**

465.    During the Class Period, Novo and Optum conducted and participated in the conduct of the affairs of the Novo-Optum Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

466.    Novo and Optum exerted control over the Novo-Optum Enterprise and participated in the operation and management of the affairs of the Novo-Optum Enterprise, directly or indirectly, in the following ways:

a.  Novo established and published the Levemir and Novolog AWP prices;

b.  Novo regularly raised Levemir and Novolog Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

c. Novo paid Optum substantial rebates/kickbacks in exchange for the Optum's commitment to give Levemir and Novolog exclusive, or at least favorable, formulary placement;

d. Novo concealed from Plaintiff and members of the Classes the existence of rebates/kickbacks that were included in Direct Purchaser Prices;

e. Novo intended that Optum would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Levemir and Novolog) saved health care purchasers money on their prescription needs and knew that Optum did distribute those material misrepresentations;

f. Novo made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Levemir and Novolog without stating that those price increases included kickbacks paid to Optum;

g. Optum negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Levemir and Novolog;

h. Optum developed formularies that provided Novo favorable placements for Levemir and Novolog based on the rebates/kickbacks that Optum would earn from the sale of those products;

i. Optum excluded competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

j. Optum marketed formularies to health plan clients and made material misrepresentations that the rebates/kickbacks negotiated from Novo saved those clients and their members money;

k. Optum made material misrepresentations that the AWP prices that Novo published reflected the actual prices of these insulin products and did not include kickbacks received by the PBM Defendants; and

l. Optum concealed the actual rebated earned from Novo from health plan clients and the general public, and therefore concealed the actual, net amount Novo received for these insulin products.

467. Optum's conduct and participation are essential to the success of the enterprise. For Novo to maintain its net prices for its products, it required Optum to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices. It also

required Optum to market its health plan clients that the rebates Novo offered saved the clients and their members money to conceal the actual rebates paid by Novo. Optum's participation allowed Novo to inflate its AWP prices, offer larger rebates to Optum to maintain access to that portion of the market, and still earn additional profits.

468.     Novo and Optum's pattern of racketeering activity involved thousands of separate instances where Novo and Optum used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Schemes.

469.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Levemir® FlexPen® 5X3ML was various prices starting at $158.15 in January 2009 and increasing to $333.12 by September 2014.

470.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Levemir® FlexTouch® was various prices starting at $287.96 in June 2014 and increasing to $403.50 by May 2016.

471.     Based on information currently available, during the class period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Levemir® 100 unit/ML 10 ML vile was various prices starting at $81.11 in January 2009 and increasing to $269.00 by May 2016.

472.     In all circumstances, Novo concealed the Price Inflation Schemes and concealed that Novo would pay a substantial portion of the quoted Direct Purchaser Prices to Optum to fund that scheme.

473.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® FlexPen® 5X3ML was various prices starting at $167.45 in January 2009 and increasing to $457.10 by May 2016.

474.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® Penfill® 3ML was various prices starting at $161.03 in January 2009 and increasing to $415.10 by October 2015.

475.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® 100 unit/ML 10 ML vile was various prices starting at $86.69 in January 2009 and increasing to $236.70 by May 2016.

476.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® Mix 70/30 FlexPen® 5X3ML was various prices starting at $167.45 in January 2009 and increasing to $457.10 by May 2016.

477.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® Mix 70/30 100 unit/ML 10 ML vile was various prices starting at $86.69 in January 2009 and increasing to $245.50 by April 2016.

478.     In all circumstances, Novo concealed the Price Inflation Schemes and concealed that Novo would pay a substantial portion of the quoted Direct Purchaser Prices to Optum to fund that scheme.

479.    Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

480.    By means of that pattern of racketeering activity, Novo and Optum defrauded Plaintiff and members of the Classes.

481.    Novo's and Optum's acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

482.    Novo and Optum intentionally crafted the Levemir and Novolog Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Levemir and Novolog.

483.    When Novo and Optum designed and implemented its illicit scheme, Novo and Optum were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

484.    The pattern of racketeering activity alleged herein and the Novo-Optum Pricing Enterprise are separate and distinct from each other.  Likewise, Novo and Optum are distinct from the Novo-Optum Pricing Enterprise.

485.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Novo's and Optum's Use of the U.S. Mail and Interstate Wire Facilities**

486.    The Novo-Optum Pricing Enterprise engaged in and affected interstate commerce

104

because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog; the receipt of payments by Novo from Plaintiff and members of the Classes for analog insulin drug purchases; Novo's payment of substantial rebates to Optum in exchange for the favorable placement of Levemir and Novolog on Optum's formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Novo paid to Optum.

487. During the Class Period, the Novo-Optum Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

488. The nature and pervasiveness of the Levemir and Novolog Price Inflation Schemes, which was orchestrated out of the corporate headquarters of Novo and Optum, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

489. For example, to perpetrate the Levemir and Novolog Price Inflation Schemes, Novo used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog.  Novo distributed those fraudulent representations in:

     a. Marketing materials concerning Novo's Levemir and Novolog AWP prices that Novo transmitted to health care payers and health care providers located across the country;

b. The annual written disclosures that Novo made to the publishers of AWP price compendia regarding the Levemir and Novolog AWP prices and their subsequent mark-ups;

c. Written materials provided to Optum and telephonic discussions with Optum regarding Levemir and Novolog markups and AWP prices and the rebates paid by Novo to Optum related to those medications;

d. Numerous e-mails and text messages between Novo and Optum regarding the operation of the Enterprise's Price Inflation Schemes; and

e. Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Levemir and Novolog; (ii) the existence, amount, and purpose of the Levemir and Novolog rebates; and (iii) the true costs of Levemir and Novolog after the payment of Novo's rebates to Optum.

490.   Novo also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive payments from Plaintiff and members of the Classes for purchases of Levemir and Novolog.  Those payments constituted the wrongful proceeds of the racketeering activity in which Novo and Optum engaged.

491.   The materially false and misleading representations that Novo made in furtherance of the Price Inflation Schemes that the Levemir/Novolog Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Levemir and Novolog pricing, and forestall changes to healthcare payers' historical practice of utilizing Levemir and Novolog AWP prices as a basis for prescription reimbursement.

### D.  The Damages Caused by Novo's and Optum's Levemir and Novolog Price Inflation Schemes

492.   Novo's and Optum's pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because

Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Levemir and/or Novolog.

493.     But for the fraudulent representations and material omissions made by Novo and Optum, and the fraudulent pricing scheme the Levemir/Novolog Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for the Levemir and Novolog they purchased.

494.     Even though the Levemir/Novolog Pricing Enterprise was operated to provide Novo with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Novo's competitors.

495.     Plaintiff and those similarly situated were directly harmed by Novo's fraud and pattern of racketeering activity.  There is no other plaintiff or class of plaintiffs  better situated to seek a remedy for the economic harms that Novo's and Optum's fraudulent scheme caused to direct purchasers of Levemir and Novolog from Novo. By virtue of these violations of 18 U.S.C. § 1962(c), Novo and Optum are liable to Plaintiff and the members of the Classes for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

### ELEVENTH CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962 Against Novo and Express Scripts)

496.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

497.     Plaintiff brings this claim on behalf of the Class against Novo and Express Scripts pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Novo's and Express Scripts' violations of 18 U.S.C. § 1962(c).

498.    Novo and Express Scripts are each a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

499.    All members of the Classes are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Novo's and Express Scripts' wrongful conduct.

**A.  The Novo-Express Scripts Enterprise**

500.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

501.    Novo formed such an association-in-fact enterprise (the "Sanofi-Optum Enterprise") that consists of: (a) Novo, including its employees and agents; and (b) the PBM Express Scripts, including its employees and agents.

502.    The Novo-Express Scripts Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Novo and Express Scripts by providing the largest possible spread between the AWP and actual net selling price for Novo's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, Novolog, in exchange for securing exclusive, or at least favorable, formulary positions for those medications as treatments for Type 1 and 2 diabetes.

503.    To accomplish this purpose, the Novo-Express Scripts Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Levemir and Novolog and represented—

either affirmatively or through half-truths and omissions—to Plaintiff and members of the Classes that the Direct Purchaser Prices and AWP prices of Levemir and Novolog fairly and accurately reflected the actual cost of those medications in a competitive marketplace free of kickbacks and other illicit conduct.

504.    The Novo-Express Scripts Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Novo supplied to Express Scripts in connection with the purchases of Levemir and Novolog that they effectively controlled.

505.    The Novo-Express Scripts Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates.  The difference between the AWP price and the real prices of Levemir and Novolog negotiated by Express Scripts produced increased profits for Novo and Express Scripts.

506.    Thus, Novo's large rebates served to ensure that Express Scripts would place and maintain Levemir and Novolog in preferred or favorable positions on Express Scripts' formularies.

507.    By maintaining those favorable formulary positions for Levemir and Novolog, the Novo-Express Scripts Enterprise ensured that a larger number of prescriptions for those medications would be written and filled.

508.    The Novo-Express Scripts Enterprise thus advanced the joint interests of Novo and Express Scripts by producing higher sales (and therefore profits) for Novo and larger spreads, thus, allowing for larger kickbacks for Express Scripts.

509.    The Price Inflation Schemes the Novo-Express Scripts Enterprise perpetrated was dependent upon Novo charging Plaintiff and members of the Classes—all of whom are direct

purchasers of analog insulin drugs from Novo—artificially inflated prices for Levemir and Novolog to fund the kickbacks that Novo paid to Express Scripts.

510.    The persons engaged in the Novo-Express Scripts Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Novo and Express Scripts spearhead.

511.    To facilitate the Levemir/Novolog Pricing Enterprise, Novo and Express Scripts engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog and the rebates payable to Express Scripts, and otherwise plot to advance their shared interests.

512.    Novo and Express Scripts functioned as a continuing unit for the purposes of advancing the shared interests of the Novo-Express Scripts Pricing Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

513.    Express Scripts struck rebate deals with Novo to conceal the true prices of Levemir and Novolog and to profit from the inflated rebates Novo agreed to pay to Express Scripts.

514.    As a result of those rebates, Novo and Express Scripts perpetuated the Novo-Express Scripts Enterprise's scheme and reaped substantial profits.

515.    Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Novo's analog insulins, Express Scripts did not challenge Novo's reported AWP prices, terminate its role in the Novo-Express Scripts Enterprise, or disclose publicly that the Levemir and Novolog Direct Purchaser Prices that

Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

516.   Novo could not have accomplished the purpose of the Novo-Express Scripts Enterprise without the assistance of Express Scripts.

517.   For Novo to profit from the scheme, Express Scripts needed to convince health care payers and plan sponsors to approve formularies on which Levemir and Novolog were given favorable treatment.

518.   Express Scripts accomplished that objective by making a series of material misrepresentations and omissions.  In particular, Express Scripts told clients, potential clients, and investors that they secured significant discounts for the Levemir and Novolog utilized by consumers.

519.   However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Novo-Express Scripts Enterprise's Price Inflation Schemes. The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real prices of Levemir and Novolog.

520.   The Novo-Express Scripts Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

521.   The impacts of the Novo-Express Scripts Enterprise's Price Inflation Schemes persist to this day—*i.e.*, the artificially inflated prices of Levemir and Novolog to fund the rebates/kickbacks.

111

**B. Novo and Express Scripts Conducted and Participated in the Conduct of the Novo-Express Scripts Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity**

522.     During the Class Period, Novo and Express Scripts conducted and participated in the conduct of the affairs of the Novo-Express Scripts Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

523.     Novo and Express Scripts exerted control over the Novo-Express Scripts Enterprise and participated in the operation and management of the affairs of the Novo-Express Scripts Enterprise, directly or indirectly, in the following ways:

a.   Novo established and published the Levemir and Novolog AWP prices;

b.   Novo regularly raised Levemir and Novolog Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

c.   Novo paid Express Scripts substantial rebates/kickbacks in exchange for the Express Scripts' commitment to give Levemir and Novolog exclusive, or at least favorable, formulary placement;

d.   Novo concealed from Plaintiff and members of the Classes the existence of rebates/kickbacks that were included in Direct Purchaser Prices;

e.   Novo intended that Express Scripts would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Levemir and Novolog) saved health care purchasers money on their prescription needs and knew that Express Scripts did distribute those material misrepresentations;

f.   Novo made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Levemir and Novolog without stating that those price increases included kickbacks paid to Express Scripts;

g.   Express Scripts negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Levemir and Novolog;

h.   Express Scripts developed formularies that provided Novo favorable placements for Levemir and Novolog based on the rebates/kickbacks that Defendants would earn from the sale of those products;

i.   Express Scripts excluded competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

j.   Express Scripts marketed formularies to health plan clients and made material misrepresentations that the rebates/kickbacks negotiated from Novo saved those clients and their members money;

k.   Express Scripts made material misrepresentations that the AWP prices that Novo published reflected the actual prices of these insulin products and did not include kickbacks received by the PBM Defendants; and

l.   Express Scripts concealed the actual rebated earned from Novo from health plan clients and the general public, and therefore concealed the actual, net amount Novo received for these insulin products.

524.   Express Scripts' conduct and participation are essential to the success of the enterprise. For Novo to maintain its net prices for its products, it required Express Scripts to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices.  It also required Express Scripts to market its health plan clients that the rebates Novo offered saved the clients and their members money to conceal the actual rebates paid by Novo. Express Scripts' participation allowed Novo to inflate its AWP prices, offer larger rebates to Express Scripts to maintain access to that portion of the market, and still earn additional profits.

525.   Novo and Express Scripts' pattern of racketeering activity involved thousands of separate instances where Novo and Express Scripts used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Schemes.

526.   Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Levemir® FlexPen® 5X3ML was various prices starting at $158.15 in January 2009 and increasing to $333.12 by September 2014.

527.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Levemir® FlexTouch® was various prices starting at $287.96 in June 2014 and increasing to $403.50 by May 2016.

528.     Based on information currently available, during the class period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Levemir® 100 unit/ML 10 ML vile was various prices starting at $81.11 in January 2009 and increasing to $269.00 by May 2016.

529.     In all circumstances, Novo concealed the Price Inflation Schemes and concealed that Novo would pay a substantial portion of the quoted Direct Purchaser Prices to Express Scripts to fund that scheme.

530.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® FlexPen® 5X3ML was various prices starting at $167.45 in January 2009 and increasing to $457.10 by May 2016.

531.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® Penfill® 3ML was various prices starting at $161.03 in January 2009 and increasing to $415.10 by October 2015.

532.     Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® 100 unit/ML 10 ML vile was various prices starting at $86.69 in January 2009 and increasing to $236.70 by May 2016.

533.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® Mix 70/30 FlexPen® 5X3ML was various prices starting at $167.45 in January 2009 and increasing to $457.10 by May 2016.

534.    Based on information currently available, during the Class Period, Novo utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Novolog® Mix 70/30 100 unit/ML 10 ML vile was various prices starting at $86.69 in January 2009 and increasing to $245.50 by April 2016.

535.    In all circumstances, Novo concealed the Price Inflation Schemes and concealed that Novo would pay a substantial portion of the quoted Direct Purchaser Prices to Express Scripts to fund that scheme.

536.    Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

537.    By means of that pattern of racketeering activity, Novo and Express Scripts defrauded Plaintiff and members of the Classes.

538.    Novo's and Express Scripts' acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

539.    Novo and Express Scripts intentionally crafted the Levemir and Novolog Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their

illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Levemir and Novolog.

540.    When Novo and Express Scripts designed and implemented its illicit scheme, Novo and Express Scripts were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

541.    The pattern of racketeering activity alleged herein and the Novo-Express Scripts Pricing Enterprise are separate and distinct from each other.  Likewise, Novo and Express Scripts are distinct from the Novo-Express Scripts Pricing Enterprise.

542.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Novo's and Express Scripts' Use of the U.S. Mail and Interstate Wire Facilities**

543.    The Novo-Express Scripts Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog; the receipt of payments by Novo from Plaintiff and members of the Classes for analog insulin drug purchases; Novo's payment of substantial rebates to Express Scripts in exchange for the favorable placement of Levemir and Novolog on Express Scripts' formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Novo paid to Express Scripts.

544.    During the Class Period, the Novo-Express Scripts Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state

boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

545.    The nature and pervasiveness of the Levemir and Novolog Price Inflation Schemes, which was orchestrated out of the corporate headquarters of Novo and Express Scripts, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

546.    For example, to perpetrate the Levemir and Novolog Price Inflation Schemes, Novo used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Levemir and Novolog.  Novo distributed those fraudulent representations in:

a.  Marketing materials concerning Novo's Levemir and Novolog AWP prices that Novo transmitted to health care payers and health care providers located across the country;

b.  The annual written disclosures that Novo made to the publishers of AWP price compendia regarding the Levemir and Novolog AWP prices and their subsequent mark-ups;

c.  Written materials provided to Express Scripts and telephonic discussions with Express Scripts regarding Levemir and Novolog markups and AWP prices and the rebates paid by Novo to Express Scripts related to those medications;

d.  Numerous e-mails and text messages between Novo and Express Scripts regarding the operation of the  Enterprise's Price Inflation Schemes; and

e.  Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Levemir and Novolog; (ii) the existence, amount, and purpose of the Levemir and Novolog rebates; and (iii) the true costs of Levemir and Novolog after the payment of Novo's rebates to Express Scripts.

547.    Novo also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive payments from Plaintiff and members of the Classes for purchases of Levemir and Novolog.  Those

payments constituted the wrongful proceeds of the racketeering activity in which Novo and Express Scripts engaged.

548.    The materially false and misleading representations that Novo made in furtherance of the Price Inflation Schemes that the Levemir/Novolog Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Levemir and Novolog pricing, and forestall changes to healthcare payers' historical practice of utilizing Levemir and Novolog AWP prices as a basis for prescription reimbursement.

### D.  The Damages Caused by Novo's and Express Scripts' Levemir and Novolog Price Inflation Schemes

549.    Novo's and Express Scripts' pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Levemir and/or Novolog.

550.    But for the fraudulent representations and material omissions made by Novo and Express Scripts, and the fraudulent pricing scheme the Levemir/Novolog Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for the Levemir and Novolog they purchased.

551.    Even though the Levemir/Novolog Pricing Enterprise was operated to provide Novo with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Novo's competitors.

552.    Plaintiff and those similarly situated were directly harmed by Novo's fraud and pattern of racketeering activity.  There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms that Novo's and Express Scripts' fraudulent scheme caused to direct purchasers of Levemir and Novolog from Novo.

553.     By virtue of these violations of 18 U.S.C. § 1962(c), Novo and Express Scripts are liable to Plaintiff and the members of the Classes for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

## TWELFTH CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against Lilly and CVS)

554.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

555.     Plaintiff brings this claim on behalf of the Class against Lilly and CVS pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Lilly's and CVS' violations of 18 U.S.C. § 1962(c).

556.     Lilly and CVS are each a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

557.     All members of the Classes are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Lilly's wrongful conduct.

### A.   The Lilly-CVS Enterprise

558.     Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

559.     Lilly and CVS formed such an association-in-fact enterprise (the "Lilly-CVS Enterprise") that consists of: (a) Lilly, including its employees and agents; and (b) the PBM CVS Caremark, including its employees and agents.

560.    The Lilly-CVS Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Lilly and CVS by providing Lilly with the largest possible spread between the AWP and actual net selling price for Lilly's rapid-acting analog insulin product, Humalog, in exchange for securing exclusive, or at least favorable, formulary positions for that medication as a treatment for Type 1 and 2 diabetes.

561.    To accomplish this purpose, the Lilly-CVS Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Humalog and represented—either affirmatively or through half-truths and omissions—to Plaintiff and members of the Classes that the Direct Purchaser Prices of Humalog fairly and accurately reflected the actual cost of that medication in a competitive marketplace free of kickbacks and other illicit conduct.

562.    The Lilly-CVS Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Lilly supplied to CVS in connection with the purchases of Humalog that they effectively controlled.

563.    The Humalog Pricing Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates.  The difference between the AWP price and the real price of Humalog negotiated by CVS produced increased profits for CVS.

564.    Thus, Lilly's large rebates served to ensure that CVS would place and maintain Humalog in preferred or favorable positions on CVS' formularies.

565.    By maintaining those favorable formulary positions for Humalog, the Lilly-CVS Enterprise ensured that a larger number of prescriptions for that medication would be written and filled.

566.    The Lilly-CVS Enterprise thus advanced the joint interests of Lilly and CVS by producing higher sales (and therefore profits) for Lilly and larger spreads, thus, allowing for larger kickbacks for CVS.

567.    The Lilly-CVS Enterprise was dependent upon Lilly charging Plaintiff and members of the Classes —all of whom are direct purchasers of Humalog from Lilly—artificially inflated prices for Humalog to fund the kickbacks that Lilly paid to CVS.

568.    The persons engaged in the Humalog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Lilly spearheads.

569.    To facilitate the Humalog Pricing Enterprise, Lilly and CVS engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Humalog and the rebates payable to CVS, and otherwise plot to advance their shared interests.

570.    Lilly and CVS functioned as a continuing unit for the purposes of advancing the shared interests of the Humalog Pricing Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

571.    Lilly and CVS were knowing and willing participants in the Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

572.    CVS struck rebate deals with Lilly to conceal the true prices of Humalog and to profit from the inflated rebates Lilly agreed to pay to CVS.

573.    As a result of those rebates, however, Lily and CVS perpetuated the Humalog Pricing Enterprise's scheme and reaped substantial profits.

574.    Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Lily's analog insulins, CVS did not challenge Lily's reported AWP prices, terminate its role in the Lily-CVS Enterprise, or disclose publicly that the Levemir and Novolog Direct Purchaser Prices that Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

575.    Lilly could not have accomplished the purpose of the Humalog Pricing Enterprise without the assistance of CVS.

576.    For Lilly to profit from the scheme, CVS needed to convince health care payers and plan sponsors to approve formularies on which Humalog was given favorable treatment.

577.    CVS accomplished that objective by making a series of material misrepresentations and omissions.  In particular, it told clients, potential clients, and investors that they secured significant discounts for the Humalog utilized by consumers.

578.    However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Humalog Pricing Enterprise's Price Inflation Schemes.  The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real price of Humalog.

579.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

580.    The impacts of the Humalog Pricing Enterprise's Price Inflation Schemes persist to this day—*i.e.*, the artificially inflated prices of Humalog to fund the rebates/kickbacks.

**B.   Lilly and CVS Conducted and Participated in the Conduct of the Humalog Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity**

581.     During the Class Period, Lilly and CVS conducted and participated in the conduct of the affairs of the Humalog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

582.     Lilly and CVS exerted control over the Humalog Pricing Enterprise and participated in the operation and management of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

a.  Lilly established and published the Humalog AWP prices;

b.  Lilly regularly raised the Humalog Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

c.  Lilly paid CVS substantial rebates/kickbacks in exchange for CVS' commitment to give Humalog exclusive or favorable formulary placement;

d.  Lilly concealed from Plaintiff and members of the Classes the existence of the rebates/kickbacks that were included in Direct Purchaser Prices;

e.  Lilly intended that CVS would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Humalog) saved health care purchasers money on their prescription needs and knew that CVS did distribute those material misrepresentations; and

f.  Lilly made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Humalog without stating that those price increases included kickbacks paid to CVS;

g.  CVS negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Humalog;

h.  CVS developed formularies that provided Lilly favorable placements for Humalog based on the rebates/kickbacks that CVS would earn from the sale of these products;

i.  CVS would exclude competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

j.   CVS marketed formularies to health plan clients and making material representations that the rebates/kickbacks negotiated from Lilly saved those clients money and their members money;

k.   CVS made material misrepresentations that the AWP prices that Lilly published reflected the actual prices of this insulin product and did not include kickbacks received by the PBM Defendants; and

l.   CVS concealed the actual rebates earned from Lilly from health plan clients and the general public, and therefore concealed the actual, net amount Lilly received for this insulin product.

583.   CVS's conduct and participation are essential to the success of the enterprise. For Lily to maintain its net prices for its products, it required CVS to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices.  It also required CVS to market its health plan clients that the rebates Lily offered saved the clients and their members money to conceal the actual rebates paid by Lily. CVS's participation allowed Lily to inflate its AWP prices, offer larger rebates to CVS to maintain access to that portion of the market, and still earn additional profits.

584.   Lilly's and CVS' pattern of racketeering activity involved thousands of separate instances where Lilly and CVS used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Schemes.

585.   Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Cartridge 5X3ML was various prices starting at $159.70 in February 2009 and increasing to $440.40 in April 2016.

586.   Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of

Humalog® KwikPen® 2X3ML was various prices starting at $313.19 in July 2015 and increasing to $366.12 by May 2016.

587.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Pen Pref 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $207.85 by November 2010.

588.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 50/50 Pen 5X3ML was various prices starting at $166.05 in February 2009 and increasing to $192.45 by August 2010.

589.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 75/25 Pen 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $207.85 by November 2010.

590.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 75/25 vial was various prices starting at $86.00 in January 2009 and increasing to $245.60 by May 2016.

591.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 100Units/ML vial was various prices starting at $86.00 in January 2009 and increasing to $237.00 by May 2016.

592.     Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 50/50 KwikPen® 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $457.65 by May 2016.

593.     Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 50/50 vial was various prices starting at $86.00 in January 2009 and increasing to $230.80 by August 2015.

594.     Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 75/25 KwikPen® was various prices starting at $166.05 in January 2009 and increasing to $457.65 by May 2016.

595.     In all circumstances, Lilly and CVS concealed the Price Inflation Schemes and concealed that Lilly would pay a substantial portion of the quoted Direct Purchaser Prices to CVS to fund that scheme.

596.     Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

597.     By means of that pattern of racketeering activity, Lilly and CVS defrauded Plaintiff and members of the Classes.

598.     Lilly's and CVS' acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

599.     Lilly and CVS intentionally crafted the Humalog Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Humalog.

600.     When Lilly and CVS designed and implemented its illicit scheme, Lilly and CVS were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

601.     The pattern of racketeering activity alleged herein, and the Lilly-CVS Enterprise, are separate and distinct from each other.  Likewise, Lilly and CVS are each distinct from the Lilly-CVS Enterprise.

602.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Lilly's and CVS' Use of the U.S. Mail and Interstate Wire Facilities**

603.     The Lilly-CVS Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Humalog; the receipt of payments by Lilly from Plaintiff and members of the Classes for analog insulin drug purchases; Lilly's payment of substantial rebates to CVS in exchange for the favorable placement of Humalog on CVS' formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Lilly paid to CVS.

604.     During the Class Period, the Lilly-CVS Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

605.     The nature and pervasiveness of the Lilly-CVS Price Inflation Schemes, which was orchestrated out of the corporate headquarters of Lilly and CVS, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

606.     For example, to perpetrate the Humalog Price Inflation Schemes, Lilly used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Humalog. Lilly distributed those fraudulent representations in:

    a.  Marketing materials concerning Lilly's AWP prices that Lilly transmitted to health care payers and health care providers located across the country;

    b.  The annual written disclosures that Lilly made to the publishers of AWP price compendia regarding Humalog AWP prices and Lilly's subsequent mark-ups;

    c.  Written materials provided to CVS and telephonic discussions with CVS regarding Humalog markups and AWP prices and the rebates paid by Lilly to CVS related to that medication;

    d.  Numerous e-mails and text messages between Lilly and CVS regarding the operation of the Humalog Pricing Enterprise's Price Inflation Schemes, and pattern of racketeering activity; and

    e.  Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Humalog; (ii) the existence, amount, and purpose of the Humalog rebates; and (iii) the true costs of Humalog after the payment of Lilly's rebates to CVS.

607.     Lilly and CVS also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive

payments from Plaintiff and members of the Classes for purchases of Humalog.  Those payments constituted the wrongful proceeds of the racketeering activity in which Lilly and CVS engaged.

608.    The materially false and misleading representations that Lilly and CVS made in furtherance of the Price Inflation Schemes that the Humalog Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Humalog pricing, and forestall changes to healthcare payers' historical practice of utilizing Humalog AWP prices as a basis for prescription reimbursement.

### D.   The Damages Caused by Lilly's and CVS' Humalog Price Inflation Schemes

609.    Lilly's and CVS' pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Humalog.

610.    But for the fraudulent representations and material omissions made by Lilly and CVS, and the fraudulent pricing scheme the Humalog Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for Humalog.

611.    Even though the Humalog Pricing Enterprise was operated to provide Lilly with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Lilly's competitors.

612.    Plaintiff and those similarly situated were most directly harmed by Lilly's and CVS' fraud and pattern of racketeering activity.  There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms that Lilly's and CVS' fraudulent scheme caused to direct purchasers of Humalog from Lilly.

613.    By virtue of these violations of 18 U.S.C. § 1962(c), Lilly and CVS are liable to Plaintiff and members of the Classes for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

## THIRTEENTH CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against Lilly and Optum)

614.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

615.    Plaintiff brings this claim on behalf of the Class against Lilly and Optum pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Lilly's and CVS' violations of 18 U.S.C. § 1962(c).

616.    Lilly and Optum are each a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

617.    All members of the Classes are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Lilly's wrongful conduct.

**A.  The Lilly-Optum Enterprise**

618.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

619.    Lilly and Optum formed such an association-in-fact enterprise (the "Lilly-Optum Enterprise") that consists of: (a) Lilly, including its employees and agents; and (b) the PBM Optum including its employees and agents.

130

620.     The Lilly-Optum Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Lilly and Optum by providing Lilly with the largest possible spread between the AWP and actual net selling price for Lilly's rapid-acting analog insulin product, Humalog, in exchange for securing exclusive, or at least favorable, formulary positions for that medication as a treatment for Type 1 and 2 diabetes.

621.     To accomplish this purpose, the Lilly-Optum Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Humalog and represented—either affirmatively or through half-truths and omissions—to Plaintiff and members of the classes that the Direct Purchaser Prices of Humalog fairly and accurately reflected the actual cost of that medication in a competitive marketplace free of kickbacks and other illicit conduct.

622.     The Lilly-Optum Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Lilly supplied to Optum in connection with the purchases of Humalog that they effectively controlled.

623.     The Humalog Pricing Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates.  The difference between the AWP price and the real price of Humalog negotiated by Optum produced increased profits for Optum.

624.     Thus, Lilly's large rebates served to ensure that Optum would place and maintain Humalog in preferred or favorable positions on Optum's formularies.

625.     By maintaining those favorable formulary positions for Humalog, the Lilly-Optum Enterprise ensured that a larger number of prescriptions for that medication would be written and filled.

131

626.    The Lilly-Optum Enterprise thus advanced the joint interests of Lilly and Optum by producing higher sales (and therefore profits) for Lilly and larger spreads, thus, allowing for larger kickbacks for CVS.

627.    The Lilly-Optum Enterprise was dependent upon Lilly charging Plaintiff and members of the Classes —all of whom are direct purchasers of Humalog from Lilly—artificially inflated prices for Humalog to fund the kickbacks that Lilly paid to Optum.

628.    The persons engaged in the Humalog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Lilly spearheads.

629.    To facilitate the Humalog Pricing Enterprise, Lilly and Optum engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Humalog and the rebates payable to Optum, and otherwise plot to advance their shared interests.

630.    Lilly and Optum functioned as a continuing unit for the purposes of advancing the shared interests of the Humalog Pricing Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

631.    Lilly and Optum were knowing and willing participants in the Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

632.    Optum struck rebate deals with Lilly to conceal the true prices of Humalog and to profit from the inflated rebates Lilly agreed to pay to Optum.

633.    As a result of those rebates, Lily and Optum perpetuated the Humalog Pricing Enterprise's scheme and reaped substantial profits.

634. Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Lilly's analog insulins, Optum did not challenge Lilly's reported AWP prices, terminate its role in the Lilly-Optum Enterprise, or disclose publicly that the Humalog Direct Purchaser Prices that Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

635. Lilly could not have accomplished the purpose of the Humalog Pricing Enterprise without the assistance of Optum.

636. For Lilly to profit from the scheme, Optum needed to convince health care payers and plan sponsors to approve formularies on which Humalog was given favorable treatment.

637. Optum accomplished that objective by making a series of material misrepresentations and omissions. In particular, it told clients, potential clients, and investors that they secured significant discounts for the Humalog utilized by consumers.

638. However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Humalog Pricing Enterprise's Price Inflation Schemes. The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real price of Humalog.

639. The Humalog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

640. The impacts of the Humalog Pricing Enterprise's Price Inflation Schemes persist to this day—*i.e.*, the artificially inflated prices of Humalog to fund the rebates/kickbacks.

133

### B. Lilly and Optum Conducted and Participated in the Conduct of the Humalog Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity

641.    During the Class Period, Lilly and Optum conducted and participated in the conduct of the affairs of the Humalog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

642.    Lilly and Optum exerted control over the Humalog Pricing Enterprise and participated in the operation and management of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

a.  Lilly established and published the Humalog AWP prices;

b.  Lilly regularly raised Humalog Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

c.  Lilly paid Optum substantial rebates/kickbacks in exchange for Optum's commitment to give Humalog exclusive or favorable formulary placement;

d.  Lilly concealed from Plaintiff and members of the Classes the existence of rebates/kickbacks that were included in Direct Purchaser Prices;

e.  Lilly intended that Optum would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Humalog) saved health care purchasers money on their prescription needs and knew that Optum did distribute those material misrepresentations; and

f.  Lilly made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Humalog without stating that those price increases included kickbacks paid to Optum;

g.  Optum negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Humalog;

h.  Optum developed formularies that provided Lilly favorable placements for Humalog based on the rebates/kickbacks that Optum would earn from the sale of these products;

     i.     Optum would exclude competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

     j.     Optum marketed formularies to health plan clients and making material representations that the rebates/kickbacks negotiated from Lilly saved those clients and their members money;

     k.     Optum made material misrepresentations that the AWP prices that Lilly published reflected the actual prices of these insulin products and did not include kickbacks received by the PBM Defendants; and

     l.     Optum concealed the actual rebates earned from Lilly from health plan clients and the general public, and therefore concealed the actual, net amount Lilly received for these insulin products.

643.    Optum's conduct and participation are essential to the success of the enterprise. For Lilly to maintain its net prices for its products, it required Optum to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices.  It also required Optum to market its health plan clients that the rebates Lilly offered saved the clients and their members money to conceal the actual rebates paid by Lilly. Optum's participation allowed Lilly to inflate its AWP prices, offer larger rebates to Optum to maintain access to that portion of the market, and still earn additional profits.

644.    Lilly's and Optum's pattern of racketeering activity involved thousands of separate instances where Lilly and Optum used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Schemes.

645.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Cartridge 5X3ML was various prices starting at $159.70 in February 2009 and increasing to $440.40 in April 2016,

646.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of

Humalog® KwikPen® 2X3ML was various prices starting at $313.19 in July 2015 and increasing to $366.12 by May 2016,

647.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Pen Pref 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $207.85 by November 2010.

648.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 50/50 Pen 5X3ML was various prices starting at $166.05 in February 2009 and increasing to $192.45 by August 2010.

649.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 75/25 Pen 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $207.85 by November 2010.

650.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 75/25 vial was various prices starting at $86.00 in January 2009 and increasing to $245.60 by May 2016.

651.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 100Units/ML vial was various prices starting at $86.00 in January 2009 and increasing to $237.00 by May 2016.

652.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 50/50 KwikPen® 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $457.65 by May 2016.

653.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 50/50 vial was various prices starting at $86.00 in January 2009 and increasing to $230.80 by August 2015.

654.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 75/25 KwikPen® was various prices starting at $166.05 in January 2009 and increasing to $457.65 by May 2016.

655.    In all circumstances, Lilly and Optum concealed the Price Inflation Schemes and concealed that Lilly would pay a substantial portion of the quoted Direct Purchaser Prices to Optum to fund that scheme.

656.    Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

657.    By means of that pattern of racketeering activity, Lilly and Optum defrauded Plaintiff and members of the Classes.

658.    Lilly's and Optum's acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

659.    Lilly and Optum intentionally crafted the Humalog Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Humalog.

660.    When Lilly and Optum designed and implemented its illicit scheme, Lilly and Optum were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

661.    The pattern of racketeering activity alleged herein, and the Lilly-Optum Enterprise, are separate and distinct from each other.  Likewise, Lilly and Optum are each distinct from the Lilly-Optum Enterprise.

662.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.   Lilly's and Optum's Use of the U.S. Mail and Interstate Wire Facilities**

663.    The Lilly-Optum Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Humalog; the receipt of payments by Lilly from Plaintiff and members of the Classes for analog insulin drug purchases; Lilly's payment of substantial rebates to Optum in exchange for the favorable placement of Humalog on Optum's formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Lilly paid to Optum.

138

664.     During the Class Period, the Lilly-Optum Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

665.     The nature and pervasiveness of the Lilly-Optum Price Inflation Schemes, which was orchestrated out of the corporate headquarters of Lilly and Optum, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

666.     For example, to perpetrate the Humalog Price Inflation Schemes, Lilly used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Humalog. Lilly distributed those fraudulent representations in:

    a.  Marketing materials concerning Lilly's AWP prices that Lilly transmitted to health care payers and health care providers located across the country;

    b.  The annual written disclosures that Lilly made to the publishers of AWP price compendia regarding Humalog AWP prices and Lilly's subsequent mark-ups;

    c.  Written materials provided to Optum and telephonic discussions with Optum regarding Humalog markups and AWP prices and the rebates paid by Lilly to Optum related to that medication;

    d.  Numerous e-mails and text messages between Lilly and Optum regarding the operation of the Humalog Pricing Enterprise's Price Inflation Schemes, and pattern of racketeering activity; and

    e.  Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Humalog; (ii) the existence, amount, and purpose of the Humalog rebates; and (iii) the true costs of Humalog after the payment of Lilly's rebates to Optum.

667.     Lilly and Optum also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive

payments from Plaintiff and members of the Classes for purchases of Humalog.  Those payments constituted the wrongful proceeds of the racketeering activity in which Lilly and Optum engaged.

668.    The materially false and misleading representations that Lilly and Optum made in furtherance of the Price Inflation Schemes that the Humalog Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Humalog pricing, and forestall changes to healthcare payers' historical practice of utilizing Humalog AWP prices as a basis for prescription reimbursement.

### D.   The Damages Caused by Lilly's and Optum's Humalog Price Inflation Schemes

669.    Lilly's and Optum's pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Humalog.

670.    But for the fraudulent representations and material omissions made by Lilly and Optum, and the fraudulent pricing scheme the Humalog Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for Humalog.

671.    Even though the Humalog Pricing Enterprise was operated to provide Lilly with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Lilly's competitors.

672.    Plaintiff and those similarly situated were most directly harmed by Lilly's and Optum's fraud and pattern of racketeering activity.  There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms that Lilly's and Optum's fraudulent scheme caused to direct purchasers of Humalog from Lilly.

673.    By virtue of these violations of 18 U.S.C. § 1962(c), Lilly and Optum are liable to Plaintiff and members of the Classes for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

### FOURTEENTH CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) Against Lilly and Express Scripts)

674.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

675.    Plaintiff bring this claim on behalf of the Class against Lilly and Express Scripts pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Lilly's and Express Scripts violations of 18 U.S.C. § 1962(c).

676.    Lilly and Express Scripts are each a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

677.    All members of the Classes are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Lilly's wrongful conduct.

**A.  The Lilly-Express Scripts Enterprise**

678.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

679.    Lilly and Express Scripts formed such an association-in-fact enterprise (the "Lilly-Optum Enterprise") that consists of: (a) Lilly, including its employees and agents; and (b) the PBM Express Scripts including its employees and agents.

141

680.     The Lilly-Express Scripts Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Lilly and Express Scripts by providing Lilly with the largest possible spread between the AWP and actual net selling price for Lilly's rapid-acting analog insulin product, Humalog, in exchange for securing exclusive, or at least favorable, formulary positions for that medication as a treatment for Type 1 and 2 diabetes.

681.     To accomplish this purpose, the Lilly-Express Scripts Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Humalog and represented—either affirmatively or through half-truths and omissions—to Plaintiff and members of the Classes that the Direct Purchaser Prices of Humalog fairly and accurately reflected the actual cost of that medication in a competitive marketplace free of kickbacks and other illicit conduct.

682.     The Lilly-Express Scripts Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Lilly supplied to Express Scripts in connection with the purchases of Humalog that they effectively controlled.

683.     The Humalog Pricing Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates.  The difference between the AWP price and the real price of Humalog negotiated by Express Scripts produced increased profits for Express Scripts.

684.     Thus, Lilly's large rebates served to ensure that Express Scripts would place and maintain Humalog in preferred or favorable positions on Express Scripts' formularies.

685.     By maintaining those favorable formulary positions for Humalog, the Lilly-Express Scripts Enterprise ensured that a larger number of prescriptions for that medication would be written and filled.

686.     The Lilly-Express Scripts Enterprise thus advanced the joint interests of Lilly and Express Scripts by producing higher sales (and therefore profits) for Lilly and larger spreads, thus, allowing for larger kickbacks for Express Scripts.

687.     The Lilly-Express Scripts Enterprise was dependent upon Lilly charging Plaintiff and members of the Classes —all of whom are direct purchasers of Humalog from Lilly— artificially inflated prices for Humalog to fund the kickbacks that Lilly paid to Express Scripts.

688.     The persons engaged in the Humalog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Lilly spearheads.

689.     To facilitate the Humalog Pricing Enterprise, Lilly and Express Scripts engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Humalog and the rebates payable to Express Scripts, and otherwise plot to advance their shared interests.

690.     Lilly and Express Scripts functioned as a continuing unit for the purposes of advancing the shared interests of the Humalog Pricing Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

691.     Lilly and Express Scripts were knowing and willing participants in the Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

692.     Express Scripts struck rebate deals with Lilly to conceal the true prices of Humalog and to profit from the inflated rebates Lilly agreed to pay to Express Scripts.

693.     As a result of those rebates, Lilly and Express Scripts perpetuated the Humalog Pricing Enterprise's scheme and reaped substantial profits.

694.    Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Lilly's analog insulins, Express Scripts did not challenge Lilly's reported AWP prices, terminate its role in the Lilly-Express Scripts Enterprise, or disclose publicly that the Humalog Direct Purchaser Prices that Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

695.    Lilly could not have accomplished the purpose of the Humalog Pricing Enterprise without the assistance of Express Scripts.

696.    For Lilly to profit from the scheme, Express Scripts needed to convince health care payers and plan sponsors to approve formularies on which Humalog was given favorable treatment.

697.    Express Scripts accomplished that objective by making a series of material misrepresentations and omissions.  In particular, it told clients, potential clients, and investors that they secured significant discounts for the Humalog utilized by consumers.

698.    However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Humalog Pricing Enterprise's Price Inflation Schemes.  The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real price of Humalog.

699.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

700. The impacts of the Humalog Pricing Enterprise's Price Inflation Schemes persist to this day—*i.e.*, the artificially inflated prices of Humalog to fund the rebates/kickbacks.

**B. Lilly and Express Scripts Conducted and Participated in the Conduct of the Humalog Pricing Enterprise's Affairs Through a Pattern of Racketeering Activity**

701. During the Class Period, Lilly and Express Scripts conducted and participated in the conduct of the affairs of the Humalog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

702. Lilly and Express Scripts exerted control over the Humalog Pricing Enterprise and participated in the operation and management of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

a. Lilly established and published the Humalog AWP prices;

b. Lilly regularly raised Humalog Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

c. Lilly paid Express Scripts substantial rebates/kickbacks in exchange for Express Scripts' commitment to give Humalog exclusive or favorable formulary placement;

d. Lilly concealed from Plaintiff and members of the Classes the existence of rebates/kickbacks that were included in Direct Purchaser Prices;

e. Lilly intended that Express Scripts would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Humalog) saved health care purchasers money on their prescription needs and knew that Express Scripts did distribute those material misrepresentations; and

f. Lilly made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Humalog without stating that those price increases included kickbacks paid to Express Scripts;

g.  Express Scripts negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Humalog;

h.  Express Scripts developed formularies that provided Lilly favorable placements for Humalog based on the rebates/kickbacks that Express Scripts would earn from the sale of these products;

i.  Express Scripts would exclude competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

j.  Express Scripts marketed formularies to health plan clients and making material representations that the rebates/kickbacks negotiated from Lilly saved those clients and their members money;

k.  Express Scripts made material misrepresentations that the AWP prices that Lilly published reflected the actual prices of these insulin products and did not include kickbacks received by the PBM Defendants; and

l.  Express Scripts concealed the actual rebates earned from Lilly from health plan clients and the general public, and therefore concealed the actual, net amount Lilly received for these insulin products.

703.    Express Script's conduct and participation are essential to the success of the enterprise. For Lily to maintain its net prices for its products, it required Express Script to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices.  It also required Express Scripts to market its health plan clients that the rebates Lilly offered saved the clients and their members money to conceal the actual rebates paid by Lily. Express Script's participation allowed Lily to inflate its AWP prices, offer larger rebates to Express Scripts to maintain access to that portion of the market, and still earn additional profits.

704.    Lilly's and Express Scripts' pattern of racketeering activity involved thousands of separate instances where Lilly and Express Scripts used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Schemes.

705.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Cartridge 5X3ML was various prices starting at $159.70 in February 2009 and increasing to $440.40 in April 2016.

706.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® KwikPen® 2X3ML was various prices starting at $313.19 in July 2015 and increasing to $366.12 by May 2016.

707.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Pen Pref 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $207.85 by November 2010.

708.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 50/50 Pen 5X3ML was various prices starting at $166.05 in February 2009 and increasing to $192.45 by August 2010.

709.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 75/25 Pen 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $207.85 by November 2010.

710.    Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of

Humalog® 75/25 vial was various prices starting at $86.00 in January 2009 and increasing to $245.60 by May 2016.

711. Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® 100Units/ML vial was various prices starting at $86.00 in January 2009 and increasing to $237.00 by May 2016.

712. Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 50/50 KwikPen® 5X3ML was various prices starting at $166.05 in January 2009 and increasing to $457.65 by May 2016.

713. Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 50/50 vial was various prices starting at $86.00 in January 2009 and increasing to $230.80 by August 2015.

714. Based on information currently available, during the Class Period, Lilly utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Humalog® Mix 75/25 KwikPen® was various prices starting at $166.05 in January 2009 and increasing to $457.65 by May 2016.

715. In all circumstances, Lilly and Express Scripts concealed the Price Inflation Schemes and concealed that Lilly would pay a substantial portion of the quoted Direct Purchaser Prices to Express Scripts to fund that scheme.

716. Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these

violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C.

§ 1961(5).

717.    By means of that pattern of racketeering activity, Lilly and Express Scripts defrauded Plaintiff and members of the Classes.

718.    Lilly's and Express Scripts' acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

719.    Lilly and Express Scripts intentionally crafted the Humalog Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Humalog.

720.    Lilly and Express Scripts intentionally crafted the Humalog Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Humalog.

721.    When Lilly and Express Scripts designed and implemented its illicit scheme, Lilly and Express Scripts were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

722.    The pattern of racketeering activity alleged herein and the Lilly-Express Scripts Pricing Enterprise are separate and distinct from each other.  Likewise, Lilly and Express Scripts are distinct from the Lilly-Express Scripts Pricing Enterprise.

723.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

### A.  Lilly's and Express Scripts' Use of the U.S. Mail and Interstate Wire Facilities

724.    The Lilly-Express Scripts Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Humalog; the receipt of payments by Lilly from Plaintiff and members of the Classes for analog insulin drug purchases; Lilly's payment of substantial rebates to Express Scripts in exchange for the favorable placement of Humalog on Express Scripts' formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Lilly paid to Express Scripts.

725.    During the Class Period, the Lilly-Express Scripts Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

726.    The nature and pervasiveness of the Humalog Price Inflation Schemes, which was orchestrated out of the corporate headquarters of Lilly and Express Scripts, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

727.    For example, to perpetrate the Humalog Price Inflation Schemes, Lilly used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Humalog.  Lilly distributed those fraudulent representations in:

        a.  Marketing materials concerning Lilly's Humalog AWP prices that Lilly transmitted to health care payers and health care providers located across the country;

b. The annual written disclosures that Lilly made to the publishers of AWP price compendia regarding the Humalog AWP prices and their subsequent mark-ups;

c. Written materials provided to Express Scripts and telephonic discussions with Express Scripts regarding Humalog markups and AWP prices and the rebates paid by Lilly to Express Scripts related to those medications;

d. Numerous e-mails and text messages between Lilly and Express Scripts regarding the operation of the Enterprise's Price Inflation Schemes; and

e. Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Humalog; (ii) the existence, amount, and purpose of the Humalog rebates; and (iii) the true costs of Humalog after the payment of Lilly's rebates to Express Scripts.

728.     Lilly also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive payments from Plaintiff and members of the Classes for purchases of Humalog.  Those payments constituted the wrongful proceeds of the racketeering activity in which Lilly and Express Scripts engaged.

729.     The materially false and misleading representations that Lilly made in furtherance of the Price Inflation Schemes that the Humalog Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Humalog pricing, and forestall changes to healthcare payers' historical practice of utilizing Humalog AWP prices as a basis for prescription reimbursement.

### B. The Damages Caused by Lilly's and Express Scripts' Humalog Price Inflation Schemes

730.     Lilly's and Express Scripts' pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Humalog.

731.    But for the fraudulent representations and material omissions made by Lilly and Express Scripts, and the fraudulent pricing scheme the Humalog Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for the Humalog they purchased.

732.    Even though the Humalog Pricing Enterprise was operated to provide Lilly with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Lilly's competitors.

### FIFTEENTH CAUSE OF ACTION
**(Violation of 18 U.S.C. § 1962(c) Against Sanofi and CVS)**

733.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

734.    Plaintiff brings this claim on behalf of the Class against Sanofi and CVS pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Sanofi's and CVS' violations of 18 U.S.C. § 1962(c).

735.    Sanofi and CVS are each a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

736.    All members of the Classes are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Sanofi's wrongful conduct.

### E.  The Sanofi-CVS Enterprise

737.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

738.    Sanofi and CVS formed such an association-in-fact enterprise (the "Sanofi-CVS Enterprise") that consists of: (a) Sanofi, including its employees and agents; and (b) the PBM CVS Caremark, including its employees and agents.

739.    The Sanofi-CVS Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Sanofi and CVS by providing CVS with the largest possible spread between the AWP and actual net selling price for Sanofi's long-acting analog insulin product, Lantus, in exchange for securing exclusive, or at least favorable, formulary positions for that medication as a treatment for Type 1 and 2 diabetes.

740.    To accomplish this purpose, the Sanofi-CVS Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Lantus and represented—either affirmatively or through half-truths and omissions—to Plaintiff and members of the Classes that the Direct Purchaser Prices of Lantus fairly and accurately reflected the actual cost of that medication in a competitive marketplace free of kickbacks and other illicit conduct.

741.    The Sanofi-CVS Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Sanofi supplied to CVS in connection with the purchases of Lantus that they effectively controlled.

742.    The Sanofi-CVS Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates.  The difference between the AWP price and the real price of Lantus negotiated by CVS produced increased profits for CVS.

743.    Thus, Sanofi's large rebates served to ensure that CVS would place and maintain Lantus in preferred or favorable positions on the CVS' formularies.

744.    By maintaining those favorable formulary positions for Lantus, the Sanofi-CVS Enterprise ensured that a larger number of prescriptions for that medication would be written and filled.

745.    The Sanofi-CVS Enterprise thus advanced the joint interests of Sanofi and CVS by producing higher sales (and therefore profits) for Sanofi and larger spreads, thus, allowing for larger kickbacks for CVS.

746.    The Price Inflation Schemes the Lantus Pricing Enterprise perpetrated was dependent upon Sanofi charging Plaintiff and members of the Classes —all of whom are direct purchasers of Lantus from Sanofi—artificially inflated prices for Lantus to fund the kickbacks that Sanofi paid to CVS.

747.    The persons engaged in the Lantus Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Sanofi spearheads.

748.    To facilitate the Lantus Pricing Enterprise, Sanofi and CVS engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Lantus and the rebates payable to CVS, and otherwise plot to advance their shared interests.

749. Sanofi and CVS functioned as a continuing unit for the purposes of advancing the shared interests of the Enterprise. All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

750. Sanofi and CVS were knowing and willing participants in the Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

751. CVS struck rebate deals with Sanofi to conceal the true prices of Lantus and to profit from the inflated rebates Sanofi agreed to pay to CVS.

752. As a result of those rebates, Sanofi and CVS perpetuated the Lantus Pricing Enterprise's scheme and reaped substantial profits.

753. Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Sanofi's analog insulins, CVS did not challenge Sanofi's reported AWP prices, terminate its role in the Lantus Pricing Enterprise, or disclose publicly that the Lantus Direct Purchaser Prices that Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

754. Sanofi could not have accomplished the purpose of the Lantus Pricing Enterprise without the assistance of CVS.

755. For Sanofi to profit from the scheme, CVS needed to convince health care payers and plan sponsors to approve formularies on which Lantus was given favorable treatment.

756. CVS accomplished that objective by making a series of material misrepresentations and omissions. In particular, it told clients, potential clients, and investors that it secured significant discounts for the Lantus utilized by consumers.

757. However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Sanofi-CVS Enterprise's Price Inflation Schemes. The

supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real price of Lantus.

758.     The Sanofi-CVS Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes s throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

759.     The impacts of the Sanofi-CVS Enterprise's Price Inflation Schemes persist to this day—*i.e*., the artificially inflated prices of Lantus to fund the rebates/kickbacks.

### F.   Sanofi and CVS Conducted and Participated in the Conduct of the Sanofi-CVS Enterprise's Affairs Through a Pattern of Racketeering Activity

760.     During the Class Period, Sanofi and CVS conducted and participated in the conduct of the affairs of the Sanofi-CVS Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

761.     Sanofi and CVS exerted control over the Enterprise and participated in the operation and management of the affairs of the Enterprise, directly or indirectly, in the following ways:

    a.   Sanofi established and published the Lantus AWP prices;

    b.   Sanofi regularly raised Lantus Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

    c.   Sanofi paid CVS substantial rebates/kickbacks in exchange for CVS' commitment to give Lantus exclusive or favorable formulary placement;

    d.   Sanofi concealed from Plaintiff and members of the Classes the existence of rebates/kickbacks that were included in Direct Purchaser Prices;

    e.   Sanofi intended that CVS would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as

those applied to Lantus) saved health care purchasers money on their prescription needs and knew that CVS did distribute those material misrepresentations;

f. Sanofi made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Lantus without stating that those price increases included kickbacks paid to CVS;

g. CVS negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Lantus;

h. CVS developed formularies that provided Sanofi favorable placements for Lantus bases on the rebates/kickbacks that CVS would earn from the sale of those products;

i. CVS excluded competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

j. CVS marketed formularies to health plan clients and made material representations that the rebates/kickbacks negotiated by CVS saved those clients money and their members money;

k. CVS made material misrepresentations that the AWP prices that Sanofi published reflected the actual prices of these insulin products and did not include kickbacks received by the PBM Defendants; and

l. CVS concealed the actual rebates earned from Sanofi from health plan clients and the general public, and therefore concealed the actual, net amount Sanofi received for these insulin products.

762.    CVS's conduct and participation are essential to the success of the enterprise. For Sanofi to maintain its net prices for its products, it required CVS to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices.  It also required CVS to market its health plan clients that the rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. CVS's participation allowed Sanofi to inflate its AWP prices, offer larger rebates to CVS to maintain access to that portion of the market, and still earn additional profits.

763.     Sanofi's and CVS' pattern of racketeering activity involved thousands of separate instances where Sanofi and CVS used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Schemes.

764.     Based on information currently available, during the Class Period, Sanofi utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Lantus® Cartridges 5X3ML was various prices starting at $156.65 in January 2009 and increasing to $191.96 by February 2011.

765.     Based on information currently available, during the class period, Sanofi utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Lantus® 100 units/ml 10ML was various prices starting at $81.10 in January 2009 and increasing to $248.51 by May 2016.

766.     Based on information currently available, during the class period, Sanofi utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Lantus® Solostar® Pens 5X3ML was various prices starting at $156.65 in January 2009 and increasing to $372.76 by May 2016.

767.     In all circumstances, Sanofi concealed the Price Inflation Schemes and concealed that Sanofi would pay a substantial portion of the quoted Direct Purchaser Prices to CVS to fund that scheme.

768.      Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

769.    By means of that pattern of racketeering activity, Sanofi and CVS defrauded Plaintiff and members of the Classes.

770.    Sanofi's and CVS' acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

771.    Sanofi and CVS intentionally crafted the Lantus Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Lantus.

772.    When Sanofi and CVS designed and implemented their illicit scheme, Sanofi and CVS were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

773.    The pattern of racketeering activity alleged herein and the Sanofi-CVS Enterprise are separate and distinct from each other.  Likewise, Sanofi and CVS are distinct from the Sanofi-CVS Enterprise.

774.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**G.  Sanofi's and CVS' Use of the U.S. Mail and Interstate Wire Facilities**

775.    The Sanofi-CVS Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Lantus; the receipt of payments by Sanofi from Plaintiff and members of the Classes for analog insulin drug purchases; Sanofi's payment of substantial rebates to CVS in exchange for the favorable placement of Lantus on CVS' formularies; and the transmission of

false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Sanofi paid to CVS.

776.    During the Class Period, the Sanofi-CVS Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

777.    The nature and pervasiveness of the Lantus Price Inflation Schemes, which was orchestrated out of the corporate headquarters of Sanofi and CVS, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

778.    For example, to perpetrate the Lantus Price Inflation Schemes, Sanofi used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Lantus. Sanofi distributed those fraudulent representations in:

   a.   Marketing materials concerning Sanofi's AWP prices that Sanofi transmitted to health care payers and health care providers located across the country;

   b.   The annual written disclosures that Sanofi made to the publishers of AWP price compendia regarding Lantus AWP prices and Sanofi's mark-ups;

   c.   Written materials provided to CVS and telephonic discussions with those entities regarding Lantus markups and AWP prices and the rebates paid by Sanofi to CVS related to that medication;

   d.   Numerous e-mails and text messages between Sanofi and CVS regarding the operation of the Lantus Pricing Enterprise's Price Inflation Schemes; and pattern of racketeering activity; and

   e.   Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Lantus; (ii) the existence, amount, and purpose of the Lantus rebates; and (iii) the true costs of Lantus after the payment of Sanofi's rebates to CVS.

779.     Sanofi also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive payments from Plaintiff and members of the Classes for purchases of Lantus.  Those payments constituted the wrongful proceeds of the racketeering activity in which Sanofi and CVS engaged.

780.     The materially false and misleading representations that Sanofi and CVS made in furtherance of the Price Inflation Schemes that the Lantus Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Lantus pricing, and forestall changes to healthcare payers' historical practice of utilizing Lantus AWP prices as a basis for prescription reimbursement.

### H.  The Damages Caused by Sanofi's Lantus Price Inflation Schemes

781.     Sanofi's and CVS' pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Lantus.

782.     But for the fraudulent representations and material omissions made by Sanofi and CVS, and the fraudulent pricing scheme the Lantus Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for Lantus.

783.     Even though the Lantus Pricing Enterprise was operated to provide Sanofi with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Sanofi's competitors.

784.     Plaintiff and those similarly situated were most directly harmed by Sanofi's fraud and pattern of racketeering activity.  There is no other plaintiff or class of plaintiff s better

situated to seek a remedy for the economic harms that Sanofi's and CVS' fraudulent scheme caused to direct purchasers of Lantus from Sanofi.

785.     By virtue of these violations of 18 U.S.C. § 1962(c), Sanofi and CVS are liable to Plaintiff and members of the Classes for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

**SIXTEENTH CAUSE OF ACTION**
**(Violation of 18 U.S.C. § 1962(c) by Sanofi and Optum Enterprise)**

786.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

787.     Plaintiff brings this claim on behalf of the Class against Sanofi and Optum pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Sanofi's and Optum's violations of 18 U.S.C. § 1962(c).

788.     Sanofi and Optum are each a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

789.     All members of the Classes are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Sanofi's wrongful conduct.

### A.  The Sanofi-Optum Enterprise

790.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

791.    Sanofi and Optum formed such an association-in-fact enterprise (the "Sanofi-Optum Enterprise") that consists of: (a) Sanofi, including its employees and agents; and (b) the PBM Optum, including its employees and agents.

792.    The Sanofi-Optum Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Sanofi and Optum by providing Optum with the largest possible spread between the AWP and actual net selling price for Sanofi's long-acting analog insulin product, Lantus, in exchange for securing exclusive, or at least favorable, formulary positions for that medication as a treatment for Type 1 and 2 diabetes.

793.    To accomplish this purpose, the Sanofi-Optum Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Lantus and represented—either affirmatively or through half-truths and omissions—to Plaintiff and members of the Classes that the Direct Purchaser Prices of Lantus fairly and accurately reflected the actual cost of that medication in a competitive marketplace free of kickbacks and other illicit conduct.

794.    The Sanofi-Optum Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Sanofi supplied to Optum in connection with the purchases of Lantus that they effectively controlled.

795.    The Sanofi-Optum Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates.  The difference between the AWP price and the real price of Lantus negotiated by Optum produced increased profits for Optum.

796.    Thus, Sanofi's large rebates served to ensure that Optum would place and maintain Lantus in preferred or favorable positions on the Optum's formularies.

797.    By maintaining those favorable formulary positions for Lantus, the Sanofi-Optum Enterprise ensured that a larger number of prescriptions for that medication would be written and filled.

798.    The Sanofi-Optum Enterprise thus advanced the joint interests of Sanofi and Optum by producing higher sales (and therefore profits) for Sanofi and larger spreads, thus, allowing for larger kickbacks for Optum.

799.    The Price Inflation Schemes the Lantus Pricing Enterprise perpetrated was dependent upon Sanofi charging Plaintiff and members of the Classes —all of whom are direct purchasers of Lantus from Sanofi—artificially inflated prices for Lantus to fund the kickbacks that Sanofi paid to Optum.

800.    The persons engaged in the Lantus Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Sanofi spearheads.

801.    To facilitate the Lantus Pricing Enterprise, Sanofi and Optum engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Lantus and the rebates payable to Optum, and otherwise plot to advance their shared interests.

802.     Sanofi and Optum functioned as a continuing unit for the purposes of advancing the shared interests of the Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

803.     Sanofi and Optum were knowing and willing participants in the Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

804.     Optum struck rebate deals with Sanofi to conceal the true prices of Lantus and to profit from the inflated rebates Sanofi agreed to pay to Optum.

805.     As a result of those rebates, Sanofi and Optum perpetuated the Lantus Pricing Enterprise's scheme and reaped substantial profits.

806.     Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Sanofi's analog insulins, Optum did not challenge Sanofi's reported AWP prices, terminate its role in the Lantus Pricing Enterprise, or disclose publicly that the Lantus Direct Purchaser Prices that Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

807.     Sanofi could not have accomplished the purpose of the Lantus Pricing Enterprise without the assistance of Optum.

808.     For Sanofi to profit from the scheme, Optum needed to convince health care payers and plan sponsors to approve formularies on which Lantus was given favorable treatment.

809.     Optum accomplished that objective by making a series of material misrepresentations and omissions.  In particular, it told clients, potential clients, and investors that it secured significant discounts for the Lantus utilized by consumers.

165

810.    However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Sanofi-Optum Enterprise's Price Inflation Schemes.  The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real price of Lantus.

811.    The Sanofi-Optum Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

812.    The impacts of the Sanofi-Optum Enterprise's Price Inflation Schemes persist to this day—*i.e.*, the artificially inflated prices of Lantus to fund the rebates/kickbacks.

**B.  Sanofi and Optum Conducted and Participated in the Conduct of the Sanofi-Optum Enterprise's Affairs Through a Pattern of Racketeering Activity**

813.    During the Class Period, Sanofi and Optum conducted and participated in the conduct of the affairs of the Sanofi-Optum Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

814.    Sanofi and Optum exerted control over the Enterprise and participated in the operation and management of the affairs of the Enterprise, directly or indirectly, in the following ways:

    a.  Sanofi established and published the Lantus AWP prices;

    b.  Sanofi regularly raised Lantus Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

    c.  Sanofi paid Optum substantial rebates/kickbacks in exchange for Optum's commitment to give Lantus exclusive or favorable formulary placement;

d.  Sanofi concealed from Plaintiff and members of the Classes the existence of rebates/kickbacks that were included in Direct Purchaser Prices;

e.  Sanofi intended that Optum would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Lantus) saved health care purchasers money on their prescription needs and knew that Optum did distribute those material misrepresentations;

f.  Sanofi made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Lantus without stating that those price increases included kickbacks paid to Optum;

g.  Optum negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Lantus;

h.  Optum developed formularies that provided Sanofi favorable placements for Lantus bases on the rebates/kickbacks that Optum would earn from the sale of those products;

i.  Optum excluded competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

j.  Optum marketed formularies to health plan clients and made material representations that the rebates/kickbacks negotiated by Optum saved those clients money and their members money;

k.  Optum made material misrepresentations that the AWP prices that Sanofi published reflected the actual prices of these insulin products and did not include kickbacks received by the PBM Defendants; and

l.  Optum concealed the actual rebates earned from Sanofi from health plan clients and the general public, and therefore concealed the actual, net amount Sanofi received for these insulin products.

815.  Optum's conduct and participation are essential to the success of the enterprise. For Sanofi to maintain its net prices for its products, it required Optum to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices.  It also required Optum to market its health plan clients that the rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. Optum's

participation allowed Sanofi to inflate its AWP prices, offer larger rebates to Optum to maintain

access to that portion of the market, and still earn additional profits.

816.    Sanofi's and Optum's pattern of racketeering activity involved thousands of

separate instances where Sanofi and Optum used the U.S. Mail and interstate wire facilities in

furtherance of the unlawful Price Inflation Schemes.

817.    Based on information currently available, during the Class Period, Sanofi utilized

the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of

Lantus® Cartridges 5X3ML was various prices starting at $156.65 in January 2009 and

increasing to $191.96 by February 2011.

818.    Based on information currently available, during the class period, Sanofi utilized

the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of

Lantus® 100 units/ml 10ML was various prices starting at $81.10 in January 2009 and

increasing to $248.51 by May 2016.

819.    Based on information currently available, during the class period, Sanofi utilized

the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of

Lantus® Solostar® Pens 5X3ML was various prices starting at $156.65 in January 2009 and

increasing to $372.76 by May 2016.

820.    In all circumstances, Sanofi concealed the Price Inflation Schemes and concealed

that Sanofi would pay a substantial portion of the quoted Direct Purchaser Prices to Optum to

fund that scheme.

821.     Each of these fraudulent mailings and interstate wire transmissions constituted

"racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these

violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

822.    By means of that pattern of racketeering activity, Sanofi and Optum defrauded Plaintiff and members of the Classes.

823.    Sanofi's and Optum's acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

824.    Sanofi and Optum intentionally crafted the Lantus Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Lantus.

825.    When Sanofi and Optum designed and implemented their illicit scheme, Sanofi and Optum were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

826.    The pattern of racketeering activity alleged herein and the Sanofi-Optum Enterprise are separate and distinct from each other.  Likewise, Sanofi and Optum are distinct from the Sanofi-Optum Enterprise.

827.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Sanofi's and Optum's Use of the U.S. Mail and Interstate Wire Facilities**

828.    The Sanofi-Optum Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Lantus; the receipt of payments by Sanofi from Plaintiff and members of the Classes for

analog insulin drug purchases; Sanofi's payment of substantial rebates to Optum in exchange for the favorable placement of Lantus on Optum's formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Sanofi paid to Optum.

829.    During the Class Period, the Sanofi-Optum Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

830.    The nature and pervasiveness of the Lantus Price Inflation Schemes, which were orchestrated out of the corporate headquarters of Sanofi and Optum, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

831.    For example, to perpetrate the Lantus Price Inflation Schemes, Sanofi used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Lantus. Sanofi distributed those fraudulent representations in:

     a.   Marketing materials concerning Sanofi's AWP prices that Sanofi transmitted to health care payers and health care providers located across the country;

     b.   The annual written disclosures that Sanofi made to the publishers of AWP price compendia regarding Lantus AWP prices and Sanofi's mark-ups;

     c.   Written materials provided to Optum and telephonic discussions with those entities regarding Lantus markups and AWP prices and the rebates paid by Sanofi to Optum related to that medication;

     d.   Numerous e-mails and text messages between Sanofi and Optum regarding the operation of the Lantus Pricing Enterprise's Price Inflation Schemes; and pattern of racketeering activity; and

     e.   Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Lantus;

(ii) the existence, amount, and purpose of the Lantus rebates; and (iii) the true costs of Lantus after the payment of Sanofi's rebates to Optum.

832.     Sanofi also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive payments from Plaintiff and members of the Classes for purchases of Lantus.  Those payments constituted the wrongful proceeds of the racketeering activity in which Sanofi and Optum engaged.

833.     The materially false and misleading representations that Sanofi and Optum made in furtherance of the Price Inflation Schemes that the Lantus Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Lantus pricing, and forestall changes to healthcare payers' historical practice of utilizing Lantus AWP prices as a basis for prescription reimbursement.

### D.  The Damages Caused by Sanofi's and Optum's Lantus Price Inflation Schemes

834.     Sanofi's and Optum's pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Lantus.

835.     But for the fraudulent representations and material omissions made by Sanofi and Optum, and the fraudulent pricing scheme the Lantus Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for Lantus.

836.     Even though the Lantus Pricing Enterprise was operated to provide Sanofi with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Sanofi's competitors.

837.     Plaintiff and those similarly situated were most directly harmed by Sanofi's fraud and pattern of racketeering activity.  There is no other plaintiff or class of plaintiffs better

situated to seek a remedy for the economic harms that Sanofi's and Optum's fraudulent scheme caused to direct purchasers of Lantus from Sanofi.

838.    By virtue of these violations of 18 U.S.C. § 1962(c), Sanofi and Optum are liable to Plaintiff and members of the Classes for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

## SEVENEENTH CAUSE OF ACTION
### (Violation of 18 U.S.C. § 1962(c) by Sanofi and Express Scripts)

839.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

840.    Plaintiff brings this claim on behalf of the Class against Sanofi and Express Scripts pursuant to 18 U.S.C. § 1964(c).  This claim seeks actual damages, treble damages, and equitable relief based upon Sanofi's and Express Scripts' violations of 18 U.S.C. § 1962(c).

841.    Sanofi and Express Scripts are each a "person," within the meaning of 18 U.S.C. § 1961(3), that conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

842.    All members of the Classes are "persons," as that term is defined in 18 U.S.C. § 1961(3), that were injured in their business or property as a result of Sanofi's wrongful conduct.

### A.  The Sanofi-Express Scripts Enterprise

843.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, exhibits: (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

844.    Sanofi and Express Scripts formed such an association-in-fact enterprise (the "Sanofi-Express Scripts Enterprise") that consists of: (a) Sanofi, including its employees and agents; and (b) the PBM Express Scripts, including its employees and agents.

845.    The Sanofi-Express Scripts Enterprise is an ongoing and continuing business organization consisting of "persons," within the meaning of 18 U.S.C. § 1961(3), that created and maintained systematic links for a common purpose.  That common purpose was to enrich Sanofi and Express Scripts by providing Express Scripts with the largest possible spread between the AWP and actual net selling price for Sanofi's long-acting analog insulin product, Lantus, in exchange for securing exclusive, or at least favorable, formulary positions for that medication as a treatment for Type 1 and 2 diabetes.

846.    To accomplish this purpose, the Sanofi-Express Scripts Enterprise systematically inflated the Direct Purchaser Prices and AWP prices of Lantus and represented—either affirmatively or through half-truths and omissions—to Plaintiff and members of the Classes that the Direct Purchaser Prices of Lantus fairly and accurately reflected the actual cost of that medication in a competitive marketplace free of kickbacks and other illicit conduct.

847.    The Sanofi-Express Scripts Enterprise concealed from Plaintiff and members of the Classes the existence and amount of steep rebates that Sanofi supplied to Express Scripts in connection with the purchases of Lantus that they effectively controlled.

848.    The Sanofi-Express Scripts Enterprise also concealed from Plaintiff and members of the Classes the purpose of these rebates.  The difference between the AWP price and the real price of Lantus negotiated by Express Scripts produced increased profits for Express Scripts.

849.    Thus, Sanofi's large rebates served to ensure that Express Scripts would place and maintain Lantus in preferred or favorable positions on the Express Scripts' formularies.

850.     By maintaining those favorable formulary positions for Lantus, the Sanofi-Express Scripts Enterprise ensured that a larger number of prescriptions for that medication would be written and filled.

851.     The Sanofi-Express Scripts Enterprise thus advanced the joint interests of Sanofi and Express Scripts by producing higher sales (and therefore profits) for Sanofi and larger spreads, thus, allowing for larger kickbacks for Express Scripts.

852.     The Price Inflation Schemes the Lantus Pricing Enterprise perpetrated was dependent upon Sanofi charging Plaintiff and members of the Classes —all of whom are direct purchasers of Lantus from Sanofi—artificially inflated prices for Lantus to fund the kickbacks that Sanofi paid to Express Scripts.

853.     The persons engaged in the Lantus Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, all of which Sanofi spearheads.

854.     To facilitate the Lantus Pricing Enterprise, Sanofi and Express Scripts engage in regular communications by which they share pricing information, including data concerning the Direct Purchaser Prices and AWP prices of Lantus and the rebates payable to Express Scripts, and otherwise plot to advance their shared interests.

855.     Sanofi and Express Scripts functioned as a continuing unit for the purposes of advancing the shared interests of the Enterprise.  All members of that enterprise agreed to take actions to hide their pricing scheme and to continue the enterprise's existence.

856.     Sanofi and Express Scripts were knowing and willing participants in the Enterprise and reaped significant profits from the conduct in which the members of the enterprise engaged.

857.     Express Scripts struck rebate deals with Sanofi to conceal the true prices of Lantus and to profit from the inflated rebates Sanofi agreed to pay to Express Scripts.

858.     As a result of those rebates, Sanofi and Express Scripts perpetuated the Lantus Pricing Enterprise's scheme and reaped substantial profits.

859.     Furthermore, even as public scrutiny, media coverage, and congressional investigations began to focus on the rapidly inflating prices of Sanofi's analog insulins, Express Scripts did not challenge Sanofi's reported AWP prices, terminate its role in the Lantus Pricing Enterprise, or disclose publicly that the Lantus Direct Purchaser Prices that Plaintiff and members of the Classes were forced to pay actually funded the kickbacks to the PBM Defendants.

860.     Sanofi could not have accomplished the purpose of the Lantus Pricing Enterprise without the assistance of Express Scripts.

861.     For Sanofi to profit from the scheme, Express Scripts needed to convince health care payers and plan sponsors to approve formularies on which Lantus was given favorable treatment.

862.     Express Scripts accomplished that objective by making a series of material misrepresentations and omissions.  In particular, it told clients, potential clients, and investors that it secured significant discounts for the Lantus utilized by consumers.

863.     However, these discounts were only significant because the AWP prices were artificially inflated pursuant to the Sanofi-Express Scripts Enterprise's Price Inflation Schemes. The supposed discounts were the fictitious result of a deliberate scheme to create large rebates without lowering the real price of Lantus.

864.    The Sanofi-Express Scripts Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to Plaintiff and members of the Classes throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

865.    The impacts of the Sanofi-Express Scripts Enterprise's Price Inflation Schemes persist to this day—*i.e.*, the artificially inflated prices of Lantus to fund the rebates/kickbacks.

**B.  Sanofi and Express Scripts Conducted and Participated in the Conduct of the Sanofi-Express Scripts Enterprise's Affairs Through a Pattern of Racketeering Activity**

866.    During the Class Period, Sanofi and Express Scripts conducted and participated in the conduct of the affairs of the Sanofi-Express Scripts Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

867.    Sanofi and Express Scripts exerted control over the Enterprise and participated in the operation and management of the affairs of the Enterprise, directly or indirectly, in the following ways:

  a.  Sanofi established and published the Lantus AWP prices;

  b.  Sanofi regularly raised Lantus Direct Purchaser Prices and AWP prices to facilitate the Price Inflation Schemes;

  c.  Sanofi paid Express Scripts substantial rebates/kickbacks in exchange for Express Scripts' commitment to give Lantus exclusive or favorable formulary placement;

  d.  Sanofi concealed from Plaintiff and members of the Classes the existence of rebates/kickbacks that were included in Direct Purchaser Prices;

  e.  Sanofi intended that Express Scripts would distribute through the U.S. Mail and interstate wire facilities promotional and other materials that claimed that rebates (such as those applied to Lantus) saved health care purchasers money on their prescription needs and knew that Express Scripts did distribute those material misrepresentations;

f.   Sanofi made repeated materially misleading statements to Plaintiff and members of the Classes regarding the supposed Direct Purchaser Prices and AWP prices of Lantus without stating that those price increases included kickbacks paid to Express Scripts;

g.   Express Scripts negotiated significant rebates/kickbacks from the AWP and Direct Purchaser prices for Lantus;

h.   Express Scripts developed formularies that provided Sanofi favorable placements for Lantus bases on the rebates/kickbacks that Express Scripts would earn from the sale of those products;

i.   Express Scripts excluded competing insulin products from certain formularies in exchange for increased rebates/kickbacks;

j.   Express Scripts marketed formularies to health plan clients and made material representations that the rebates/kickbacks negotiated by Express Scripts saved those clients money and their members money;

k.   Express Scripts made material misrepresentations that the AWP prices that Sanofi published reflected the actual prices of these insulin products and did not include kickbacks received by the PBM Defendants; and

l.   Express Scripts concealed the actual rebates earned from Sanofi from health plan clients and the general public, and therefore concealed the actual, net amount Sanofi received for these insulin products.

868.   Express Scripts' conduct and participation are essential to the success of the enterprise. For Sanofi to maintain its net prices for its products, it required Express Scripts to select the products based on the rebates/kickbacks offered, rather than on which products had the lowest AWP prices.  It also required Express Scripts to market its health plan clients that the rebates Sanofi offered saved the clients and their members money to conceal the actual rebates paid by Sanofi. Express Scripts' participation allowed Sanofi to inflate its AWP prices, offer larger rebates to Express Scripts to maintain access to that portion of the market, and still earn additional profits.

869. Sanofi's and Express Scripts' pattern of racketeering activity involved thousands of separate instances where Sanofi and Express Scripts used the U.S. Mail and interstate wire facilities in furtherance of the unlawful Price Inflation Schemes.

870. Based on information currently available, during the Class Period, Sanofi utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Lantus® Cartridges 5X3ML was various prices starting at $156.65 in January 2009 and increasing to $191.96 by February 2011.

871. Based on information currently available, during the class period, Sanofi utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Lantus® 100 units/ml 10ML was various prices starting at $81.10 in January 2009 and increasing to $248.51 by May 2016.

872. Based on information currently available, during the class period, Sanofi utilized the interstate wires to represent to FWK on different occasions that the Direct Purchaser Price of Lantus® Solostar® Pens 5X3ML was various prices starting at $156.65 in January 2009 and increasing to $372.76 by May 2016.

873. In all circumstances, Sanofi concealed the Price Inflation Schemes and concealed that Sanofi would pay a substantial portion of the quoted Direct Purchaser Prices to Express Scripts to fund that scheme.

874. Each of these fraudulent mailings and interstate wire transmissions constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constituted a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5).

875.    By means of that pattern of racketeering activity, Sanofi and Express Scripts defrauded Plaintiff and members of the Classes.

876.    Sanofi's and Express Scripts' acts of racketeering activity were related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the Classes.

877.    Sanofi and Express Scripts intentionally crafted the Lantus Price Inflation Schemes to unlawfully enhance their own profits without regard for the effect that their illicit conduct would have on Plaintiff and members of the Classes, all of whom paid excessive prices for Lantus.

878.    When Sanofi and Express Scripts designed and implemented their illicit scheme, Sanofi and Express Scripts were cognizant that Plaintiff and members of the Classes rely on the integrity of the pharmaceutical companies in setting Direct Purchaser Prices and AWP prices.

879.    The pattern of racketeering activity alleged herein and the Sanofi-Express Scripts Enterprise are separate and distinct from each other.  Likewise, Sanofi and Express Scripts are distinct from the Sanofi-Express Scripts Enterprise.

880.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint, and, upon information and belief, will continue unless enjoined by this Court.

**C.  Sanofi's and Express Scripts' Use of the U.S. Mail and Interstate Wire Facilities**

881.    The Sanofi-Express Scripts Enterprise engaged in and affected interstate commerce because it engaged in the following activities, among others, across state boundaries: the transmission and publication of false and misleading information concerning the Direct Purchaser Prices and AWP prices of Lantus; the receipt of payments by Sanofi from Plaintiff and members of the Classes for analog insulin drug purchases; Sanofi's payment of substantial rebates to Express

Scripts in exchange for the favorable placement of Lantus on Express Scripts' formularies; and the transmission of false or incomplete statements intended to mislead health care purchasers regarding the existence, amount, and purpose of the rebates that Sanofi paid to Express Scripts.

882.    During the Class Period, the Sanofi-Express Scripts Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

883.    The nature and pervasiveness of the Lantus Price Inflation Schemes, which was orchestrated out of the corporate headquarters of Sanofi and Express Scripts, necessarily required those entities to communicate directly and frequently by U.S. Mail and interstate wire facilities.

884.    For example, to perpetrate the Lantus Price Inflation Schemes, Sanofi used the U.S. Mail and interstate wire facilities on thousands of occasions to distribute materially false and misleading information concerning the Direct Purchaser Prices and AWP prices of Lantus. Sanofi distributed those fraudulent representations in:

a.  Marketing materials concerning Sanofi's AWP prices that Sanofi transmitted to health care payers and health care providers located across the country;

b.  The annual written disclosures that Sanofi made to the publishers of AWP price compendia regarding Lantus AWP prices and Sanofi's mark-ups;

c.  Written materials provided to Express Scripts and telephonic discussions with those entities regarding Lantus markups and AWP prices and the rebates paid by Sanofi to Express Scripts related to that medication;

d.  Numerous e-mails and text messages between Sanofi and Express Scripts regarding the operation of the Lantus Pricing Enterprise's Price Inflation Schemes; and pattern of racketeering activity; and

e.  Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented: (i) the AWP prices of Lantus; (ii) the existence, amount, and purpose of the Lantus rebates; and (iii) the true costs of Lantus after the payment of Sanofi's rebates to Express Scripts.

885.    Sanofi also employed the U.S. Mail and interstate wires to provide inflated Direct Purchaser Prices to Plaintiff and members of the Classes and to solicit and receive payments from Plaintiff and members of the Classes for purchases of Lantus.  Those payments constituted the wrongful proceeds of the racketeering activity in which Sanofi and Express Scripts engaged.

886.    The materially false and misleading representations that Sanofi and Express Scripts made in furtherance of the Price Inflation Schemes that the Lantus Pricing Enterprise perpetrated were designed to conceal the scheme, deter investigations into Lantus pricing, and forestall changes to healthcare payers' historical practice of utilizing Lantus AWP prices as a basis for prescription reimbursement.

**D. The Damages Caused by Sanofi's and Express Scripts' Lantus Price Inflation Schemes**

887.    Sanofi's and Express Scripts' pattern of racketeering activity has directly and proximately caused Plaintiff and members of the Classes to be injured in their business or property because Plaintiff and members of the Classes paid artificially inflated Direct Purchaser Prices for Lantus.

888.    But for the fraudulent representations and material omissions made by Sanofi and Express Scripts, and the fraudulent pricing scheme the Lantus Pricing Enterprise employed, Plaintiff and the members of the Classes would have paid less for Lantus.

889.    Even though the Lantus Pricing Enterprise was operated to provide Sanofi with a wrongfully obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Sanofi's competitors.

890.    Plaintiff and those similarly situated were most directly harmed by Sanofi's fraud and pattern of racketeering activity.  There is no other plaintiff or class of plaintiffs better

situated to seek a remedy for the economic harms that Sanofi's and Express Scripts' fraudulent scheme caused to direct purchasers of Lantus from Sanofi.

891.    By virtue of these violations of 18 U.S.C. § 1962(c), Sanofi and Express Scripts are liable to Plaintiff and members of the Classes for three times the damages they have sustained, the costs of this suit, including reasonable attorneys' fees, and interest at the legal rate.

## EIGHTEENTH CAUSE OF ACTION
### (Against All Defendants for Violation of 18 U.S.C. § 1962(d))

892.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

893.    Plaintiff asserts this cause of action against all Defendants for violation of 18 U.S.C. § 1962(d).

894.    As Plaintiff alleges in detail above, each of the Defendants engaged in extensive conduct that violated RICO § 1962(c).

895.    Defendants' conspiracy with the PBM Conspirators was an essential element of their Price Inflation Schemes.  Each Defendant formed conspiracies with each of the PBM Conspirators to enhance the profits of Defendants and the PBM Conspirators at the expense of Plaintiff and members of the Classes.

896.    Defendants and the PBM Conspirators agreed to work jointly to accomplish those objectives.

897.    In addition, each of the Defendants and the PBM Conspirators undertook multiple overt acts in furtherance of the shared objectives of their conspiracy.

898.    Those overt acts included the multiple acts of mail and wire fraud that Defendants and the PBM Conspirators committed, as Plaintiff allege in detail above.

899.     As a direct and proximate result of the participation of Defendants and the PBM Conspirators in their conspiracy and the violations of 18 U.S.C. § 1962(c) that Defendants committed, Plaintiff and the members of the Classes have suffered substantial financial losses.

900.     Plaintiff and the members of the Classes made excessive payments to acquire Defendants' analog insulins.  In the absence of Defendants' racketeering activity and conspiracy with the PBM Conspirators, the Direct Purchaser Prices for Defendants' analog insulins would have been substantially lower throughout the Class Period.

901.     Defendants' racketeering activity and conspiracy with the PBM Conspirators also injured Plaintiff and the members of the Classes by suppressing the demand for Defendants' analog insulins during the Class Period because Defrauded Consumers could not afford to pay the inflated prices that prevailed at the retail level as a result of Defendants' fraud and conspiratorial misconduct.

902.     Plaintiff and the members of the Classes are therefore entitled to an award of compensatory and treble damages and the costs of this suit, including Plaintiff's attorneys' fees, all in amounts to be determined at trial.

### NINETEENTH CAUSE OF ACTION
**(Against All Defendants for Liability Under N.J.S.A. § 2C:41-2(c))**

903.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

904.     Defendants are liable persons under N.J.S.A. § 2C:41-2(c).

905.     They conducted and participated in the affairs of the Levemir/Novolog Pricing Enterprise, the Humalog Pricing Enterprises and the Lantus Pricing Enterprise (collectively, the "RICO Enterprises") through a pattern of racketeering activity.

906.    Each of the RICO Enterprises constitutes an enterprise under N.J.S.A. § 2C:41-1c. During the Class Period, each of the RICO Enterprises was engaged in, and its activities affected, trade or commerce.

907.    As is set forth in detail above, each of the Defendants conducted or participated, directly or indirectly, in the conduct of one the RICO Enterprise's affairs through a pattern of racketeering activity.

908.    Among other things, the Defendants committed repeated acts of mail and wire fraud that constituted a pattern of racketeering activity under N.J.S.A. § 2C:41-1.  By virtue of that fraudulent activity, the Direct Purchaser Prices that members of the Classes paid for Defendants' analog insulins were artificially and fraudulently inflated.

909.    As is set forth more fully above, Defendants derived substantial benefit from their pattern of racketeering activity.

910.    Defendants' fraudulent conduct did not constitute normal corporate functions.

911.    Plaintiff and the members of the Classes were injured in their businesses and property by the pattern of racketeering activity they allege because they purchased Defendants' analog insulins at inflated prices.

912.    members of the Classes are therefore entitled to an award of treble damages and the costs of this lawsuit, including reasonable attorneys' fees.


**TWENTIETH CAUSE OF ACTION**
**(Against All Defendants for Liability Under N.J.S.A. § 2C:41-2(d))**

913.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

914.    Defendants are liable persons under N.J.S.A. § 2C:41-2(c).

915.    Defendants conducted and participated in the affairs of the RICO Enterprises through a pattern of racketeering activity.

916.    Each of the RICO Enterprises constitutes an enterprise under N.J.S.A. § 2C:41-1c. During the Class Period, each of the RICO Enterprises was engaged in, and its activities affected, trade or commerce.

917.    As is set forth above, each of the Defendants conspired separately with each PBM Conspirator to further the shared objectives of the RICO Enterprises.

918.    Pursuant to that conspiracy, Defendants agreed with the PBM Conspirators that they would engage in the conduct that forms the basis for the claims that Plaintiff and the members of the Classes assert under the New Jersey RICO statute.

919.    Defendants and the PBM Conspirators agreed to assist one another in the planning and/or commission of those statutory violations.  They also agreed that Defendants would commit the numerous predicate acts of mail and wire fraud that Plaintiff allege.

920.    Each Defendant, and each PBM Conspirator, undertook numerous acts in furtherance of the shared objectives of their conspiracy.  Those overt acts include the Defendants' repeated acts of mail and wire fraud and the concealment of the kickbacks that Defendants paid to the PBM Conspirators in exchange for favorable formulary placements.

921.    By virtue of the conspiracy between Defendants and the PBM Conspirators, the Direct Purchaser Prices that members of the Classes paid for Defendants' analog insulins were artificially and fraudulently inflated.  That conduct also suppressed the volume of the sales of Defendants' analog insulins made by Plaintiff and the members of the Classes.

922.    As is set forth more fully above, Defendants derived substantial benefit from their pattern of racketeering activity and the conspiracy they entered with the PBM Defendants.

923.     Plaintiff and the members of the Classes were injured in their businesses and property by Defendants' pattern of racketeering activity and the conspiracy that they entered with the PBM Defendants because all members of the Classes purchased Defendants' analog insulins at inflated prices and made lower sales of Defendants' analog insulins than they would have made in the absence of Defendants' illicit conduct.

924.     Members of the Classes are therefore entitled to an award of treble damages and the costs of this lawsuit, including reasonable attorneys' fees.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the members of the Classes pray for relief as set forth below:

A.     Certification of the Classes pursuant to Federal Rule of Civil Procedure 23, appointment of Plaintiff as the representative, and appointment of Plaintiff's counsel as Class counsel;

B.     Permanent Injunctive relief that enjoins Defendants from violating the antitrust laws and requires them to take affirmative steps to eliminate the effects of the violations;

C.     That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

D.     That acts alleged herein be adjudged and decreed to be monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

E.     That acts alleged herein be adjudged and decreed to be in violation of the Robinson-Patman Act, 15 U.S.C. § 13;

F.     Permanent injunctive relief that enjoins Defendants from violating the federal and New Jersey RICO laws and requires them to take affirmative steps to eliminate the effects of their violations;

186

G. Declaratory relief providing that Defendants' actions violated the federal and New Jersey RICO statutes;

H. A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiff and the members of the Classes defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

I. Pre-judgment and post-judgment interest at the highest legal rate;

J. The costs of this suit, including reasonable attorneys' fees; and

K. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and all others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

**DATED:** March 31, 2020.                    Respectfully submitted,

*/s/Dianne M. Nast*
Dianne M. Nast (NJ #012611976)
Michael Tarringer
NastLaw LLC
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
Telephone: (215) 923-9300
Facsimile: (215) 923-9302
dnast@nastlaw.com
mtarringer@nastlaw.com


Michael L. Roberts
Karen S. Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Little Rock, AR 72223
Telephone: (501) 821-5575
Facsimile: (501) 821-4474
mikeroberts@robertslawfirm.us
KarenHalbert@robertslawfirm.us

Don Barrett
David M. McMullan, Jr.
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095-0927
Telephone: (662) 834-9168
Facsimile: (662) 834-2628
donbarrettpa@gmail.com
dmcmullan@barrettlawgroup.com


Phil Elbert
Charles Barrett
NEAL & HARWELL, PLC
1201 Demonbreun St.
Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
Facsimile: (615) 726-0573
pelbert@nealharwell.com
cbarrett@nealharwell.com